(No. 33770.—

H. C. HAMMER *et al.*, Appellants, *vs.* CHARLES W. SANDERS *et al.*, Appellees.

*Opinion filed March 22, 1956—Rehearing denied May 22, 1956.*

DAVIS, SCHAEFER, and KLINGBIEL, JJ., dissenting.

SCHWARTZ & COOPER, and LEON M. DESPRES, both of Chicago, (IRA S. KOLB, of counsel,) for appellants.

BRUNDAGE & SHORT, of Chicago, (CHARLES F. SHORT, and NARCISSE A. BROWN, of counsel,) for appellees.

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., and EDWIN A. STRUGALA, of counsel,) for Charles F. Carpentier, Secretary of State, *amicus curiae*.

Mr. CHIEF JUSTICE HERSHEY delivered the opinion of the court:

In the circuit court of Cook County, the plaintiffs, H. C. Hammer, Morris Norian and Richard Norian, obtained judgments against the defendants, Charles W. Sanders, John L. Fye and O. R. Thoureen, individually and as co-partners doing business as the Sanders-Fye Drilling Company, for sums paid the latter pursuant to 51 separate oil transactions. The judgments were for $40,328.18, $31,279.86 and $6,988.36, respectively.

The plaintiffs successfully maintained in the trial court that the money was for the purchase of "securities" within the meaning of section 2 of the Illinois Securities Act of 1919 (Ill. Rev. Stat. 1953, chap. 121½, par. 97,) and since

the defendants had not complied with this statute relative to registration, etc., the sales could be rescinded and, upon tender, the consideration paid, plus reasonable attorney's fees, could be recovered. Ill. Rev. Stat. 1953, chap. 121½, par. 132.

On appeal, the Appellate Court reversed, holding both that the transactions did not involve the sale of "securities" within the statutory definition and that there was no proper tender. (See 6 Ill. App.2d 346.) We allowed petition for leave to appeal and granted the Secretary of State permission to appear as *amicus curiae*.

The cause was heard on motions for summary judgment, and for the most part the facts are undisputed.

The defendants, who were in the oil business as partners under the name of Sanders-Fye Drilling Company, owned oil leases in Indiana, Illinois and Kentucky. During the summer of 1952 they concluded 51 separate transactions with the plaintiffs relative to developing these leases, 45 of which were based on so-called letter agreements and six of which were evidenced by invoices only. The letter agreements were identical in form, differing merely as to date, location of property, amount of interest, and sums of money due. For reference, we quote one of these instruments in full:

"Sanders-Fye Drilling Co.
Contractors—Oil Producers
Lamkin Building
Olney, Illinois

Date____June 15, 1952____
Re____Sec. 29, 38-13W____

| Gibson | Indiana |
|--------|---------|
| County | State |

Mr. Hy Hammer
Hammer Bros.
33 N. Western Ave.
Chicago 12, Ill.
Dear Sir:

This letter will confirm our understanding regarding your acquisition of an interest in leases on property as set forth below.

We will assign to you an undivided ____1/128th____working interest, under oil and gas leases on a block of____200____acres, located in____Gibson____County,____Indiana____, for the sum of $____242.19____.

We agree to commence or cause to be commenced, upon the leasehold estate described above, the drilling of a well for oil and/or gas, to diligently prosecute the drilling of same and to test all possible oil formations encountered to a depth of approximately ____3000____feet, unless oil or gas in commercial quantities is discovered at a lesser depth, for the sum of $____242.19____, which is your share of the drilling cost of this well. We will plug the well should it be a dry hole.

In the event of a producing well, it is understood and agreed that, in addition to the amount as set out above, you will pay your proportionate part of the casing, drilling in expense, and for all equipment necessary to complete the well, as well as your proportionate part of the monthly operating expense, upon receipt of invoice. It is also understood that for any additional wells that might be drilled, you will pay your proportionate part of all costs, which costs may include the normal drilling profit of Sanders-Fye Drilling Company.

It is agreed that each individual co-owner retains the right to revoke at will the operator's power to sell such co-owner's oil and also denies the operator the power to enter into any contract beyond the minimum needs of the industry under the circumstances and in any event in excess of one year.

It is also agreed that you are purchasing this interest for investment purposes only without any present intention of reselling this interest.

If this is your understanding of our agreement, kindly signify your acceptance by signing in the space provided below and return one copy to this office.

Very truly yours,

SANDERS-FYE DRILLING COMPANY,

By____/s/ John L. Fye____

Partner

Accepted

____/s/ Hy Hammer____

____July 21, 1952____"

In each instance, drilling was either in progress at the time the instrument was signed or commenced shortly thereafter. Shares ranged from 1/256th to 1/8th.

The first six transactions involved the drilling on an Indiana lease, and oil was discovered there in paying quantities. For these, the defendants then executed written

assignments, covering the interests specified in said letter agreements.

In six other transactions, there was also oil production. But these differed from the others. A dispute arose in which the plaintiffs claimed that one of the defendants' agents had guaranteed there would be production from a certain well, but it turned out to be a dry hole. While maintaining that the agent had no authority to make any such guarantee, the defendants said they would assign to them, at defendants' cost, interest in another lease where there was production. The transactions are evidenced by written invoices billing the plaintiffs for the cost, which they paid. No written assignments had been executed as of the time the instant suits were filed.

In all other cases, involving seven different leases, drilling resulted in dry holes and no assignments were made or further action taken.

By their complaints, filed in February, 1953, the plaintiffs sought to rescind the transactions and recover all sums expended by them. They alleged a violation of both the Illinois Securities Act of 1919 and the Federal Securities Act of 1933. The defendants disputed their right to recover, and as presented and argued in the briefs and on oral argument, the determinative issue is two-fold: (1) Were the instruments or interests involved securities which were sold in violation of the Illinois statute? (Ill. Rev. Stat. 1953, chap. 121½, par. 97.) (2) If so, did the plaintiffs make proper statutory tender? (Ill. Rev. Stat. 1953, chap. 121½, par. 132.)

The applicable provisions of the Illinois Securities Law of 1919 are as follows:

"The word 'securities' shall mean * * * any oil, gas or mining lease, royalty, or deed, and interest, units or shares in any such lease, royalty, or deed * * * 'sale' * * * shall include every disposition, or attempt to dispose, of a security or interest in a security for value. The

term 'sale' means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or thing of value, or any transfer or agreement to transfer, in trust or otherwise." Ill. Rev. Stat. 1953, chap. 121½, par. 97.

"Every sale and contract of sale made in violation of any of the provisions of this Act shall be void at the election of the purchaser, and the seller of the securities so sold * * * shall be * * * liable, in an action at law or in equity, upon tender to the seller or in court of the securities sold, to the purchaser for the amount paid, the consideration given or the value thereof, together with his reasonable attorney's fees in any action brought for such recovery." Ill. Rev. Stat. 1953, chap. 121½, par. 132.

We discuss initially those transactions evidenced by an instrument of the type set out above. In this regard, we must analyze the terms of the instrument with a view to determining, at least in a general way, its legal effect.

It appears that Sanders-Fye Drilling Company and Hy Hammer had some understanding as to the latter's acquiring an "interest" in the designated leases, and this letter is sent to confirm (or, more properly, to effectuate) that understanding.

Considered in its entirety, the instrument seems to have two purposes: (1) to assign or evidence the sale of or promise to assign, an undivided 1/128th "working interest" in the leases to Hammer for $242.19; (2) to evidence an agreement whereby Sanders-Fye is to drill a test well and Hammer is to pay $242.19 as his share of the cost, with a further provision for the payment of his "proportionate part" in equipping and operating a producing well and in drilling additional wells.

Hammer's "proportionate part" of this additional expense is obviously meant to be 1/128th, his share of the working interest. Likewise, the amount of oil to which he is to be entitled is determined by his share in the work-

ing interest. Assuming the usual 1/8th royalty to the lessor, this would give Hammer a 1/128th undivided interest in 7/8th of the oil produced. Cf. *Fry* v. *Farm Bureau Oil Co.* 3 Ill.2d 94, 95; *Illinois National Oil and Gas Co.* v. *Sinclair,* 373 Ill. 581, 582.

On its face, then, the instrument involves the sale of an undivided 1/128th working interest in the leases, coupled with or forming a part of a development contract to procure a test of the land for oil and gas. (See Summers, The Law of Oil and Gas, vol. 4, sec. 722.) Nothing further appearing, it would seem that this sale of a 1/128th working interest in the leases for the sum of $242.19 amounted to the sale of an "interest" in an oil "lease" within the purview of the Illinois statute and hence a "security." (Cf. *Securities Exchange Com.* v. *Joiner Corp.* 320 U.S. 344; *People* v. *Craven,* 219 Cal. 522; *Commonwealth* v. *Yaste,* 166 Pa. Super. 275). However, while the terms of the instrument apparently call for the payment of two identical sums, just one sum was actually paid. And this was regarded by the parties as the only amount due. Thus, Hammer did not pay $242.19 for the undivided 1/128th working interest and another $242.19 for drilling costs. Rather, he paid $242.19 only, and by his own admission this was for drilling costs alone, as provided in the third paragraph of the instrument.

When we thus consider performance, we discover what appears to be a conflict between the import of the instrument and the parties' own understanding of its terms. That such should arise, however, is not surprising in view of the varying interpretations which might with some justification be urged. Were there to be two payments, one for the working interest (second paragraph) and another for drilling costs (third paragraph)? On its face, this is certainly a reasonable interpretation. But, as the minority suggest, it might be that only one payment is contemplated. The foregoing, in our opinion, brings to light an ambiguity or

uncertainty which we may attempt to clarify by considering extrinsic evidence. And "in the determination of the meaning of an indefinite or ambiguous contract, the interpretation placed upon the contract by the parties themselves is to be considered by the court and is entitled to great, if not controlling, influence in ascertaining their understanding of its terms." 12 Am. Jur., Contracts, sec. 249, pp. 787-8. See also 12 I.L.P., Contracts, sec. 244.

The practice of the parties is enlightening. Sanders-Fye, a drilling company, held leases on property which they wished to test for oil. They estimated the cost of drilling a well to the depth at which it was believed oil would be found and then sought to finance the drilling by executing instruments like the one herein considered. After execution of the instrument, which stated the estimated drilling cost allocable to the undivided working interest transferred, they proceeded with the drilling. The various participants were then billed for the amounts they agreed to pay to defray the drilling costs. But no sums were ever paid Sanders-Fye for a working interest as such, nor was it ever intended that anything was or ever would be due for such "interest."

Significantly, the plaintiffs treated all sums advanced by them as "intangible drilling and development costs" on their Federal income tax returns, not as payments for a leasehold interest, a security, or any other capital asset. Further, Hy Hammer and Morris Norian both declared that all money expended by them was pursuant to bills of Sanders-Fye for drilling (or in one instance, equipping,) costs.

Nor did Sanders-Fye consider the money as payment for a share in a working interest. Lenn Franke, who represented Sanders-Fye in some of the transactions, stated by affidavit that the plaintiffs contacted him relative to getting into the oil business and that he explained to them the operations of the Sanders-Fye Drilling Company. Among

other things, he told them: "If you wish to join in the drilling of these wells or in any future wells, a proportionate share of the working interest in the lease covering the property where the well or wells are to be drilled, will be transferred to you at no additional cost, and in the event of a producing well, a proportionate interest will be assigned to you so that you can sell your share of the oil directly to the purchaser if you so desire." The plaintiffs nowhere assert that this does not correctly reflect their own understanding of the proposed ventures.

Now the first few ventures were successful, and the defendants executed written assignments to the plaintiffs. From these wells the plaintiffs received, and presumably are still receiving, income proportionate to their shares in the leases. The plaintiffs never at any time questioned this procedure.

Piecing all this together, we believe the record shows that the development contract aspects of the instrument were uppermost in the minds of the parties. The only sums advanced by the plaintiffs were for drilling costs—not in payment of shares in working interests. The transfer of a working interest, even if it be assumed that it was effective immediately upon execution of the instrument, merely served as a basis for agreeing on the drilling of a test well and for establishing the plaintiffs' share of the oil, if and when produced. In effect, the parties, as co-owners of the working interest, were thereby enabled to form an association for oil development, with the ultimate profits to be distributed as their interests appeared. At best, the transfer of a working interest was incidental to the development contract.

Therefore, Hammer should not be entitled to recover the $242.19 expended by him in our illustrative transaction. For even assuming he *acquired* a "security" within the statutory definition, he did not pay the $242.19 for it. This money was paid for drilling costs in accordance with

a development contract. Despite the purport of the instrument, which seems to contemplate the payment of an additional $242.19 for an undivided working interest in the leases, in point of fact no such additional amount was ever paid Sanders-Fye. Nor was such ever within the actual contemplation of the parties. In short, Hammer did not pay the stated consideration for the "security," or for that matter any sum of money, so there was no "amount paid" or "consideration given" for him to recover.

The statute contemplates the return of money expended in purchasing the "security," and it is the plaintiffs' burden to demonstrate a right to recover. In this regard, a basic distinction must be recognized here; namely, the difference between sums spent to *acquire the interest* and sums advanced to *exploit the property* (*i.e.,* test for oil and gas). If a group of people own undivided shares of a working interest, an agreement among them to develop that property is clearly not within the purview of the statute. These 45 transactions are, in substance, of the same type, even though the transfer of the interest and the entering into of the contract for drilling may be said to occur simultaneously. For while there were many ways Sanders-Fye and the plaintiffs might have arranged for the transfer of the interests and the drilling of the wells, they in fact utilized but one method. And that, as related above and as borne out by the record, was to transfer a share of the working interest to one who was willing to exploit that property with them by contributing a proportionate share of the estimated drilling costs. Sanders-Fye were not brokers, and they expected profits from oil production, not from selling working interests. All sums involved were advanced for and used in drilling, and this was fully understood by all parties concerned.

Even if we were compelled to judge the transactions without benefit of the practical construction given them by the parties themselves, as the minority apparently advocate,

we would conclude no differently and our reasoning would be much the same. The instruments on their face call for two payments, one for an undivided working interest (second paragraph) and the other for drilling costs (third paragraph). The statute allows a recovery for sums spent in purchasing the interests, but when it is shown that no such sums were in fact spent, the plaintiffs' case fails. While the statute has a wide scope and a worthy purpose, it should not be applied so as to permit the plaintiffs to recover money they expended as their share of drilling costs. Apart from the statute, there could not, in justice, be a recovery without proof of fraud, duress, or similar conduct justifying rescission. Nor as we view the matter can there be, by statute, any recovery under the circumstances here and as the issues have been presented for our decision. And while it is of no legal consequence, it is interesting to note that this is in accord with the position adopted by the Secretary of State at one time. The defendants allege, and plaintiffs do not deny, that they sought to register instruments of this type with the Secretary of State in 1936 but were informed by the then Secretary of State that the law did not require it.

Remaining for consideration are the six transactions, evidenced by invoices only, where there admittedly were sales of undivided working interests in producing wells. These clearly involved the sales of securities under our statute.

The defendants, however, question the sufficiency of the tender. They point out that the plaintiffs had received income from the wells which they did not tender, nor did they tender a written assignment, quitclaim deed, or any other written disclaimer of interest showing their relinquishment of an interest in the lease.

As to the first objection, the applicable statute contains no requirement that the income received be tendered, stating merely that "securities sold" be tendered. This was

changed by amendment in 1953, but the earlier statute governs here.

Nor was the tender otherwise insufficient. The sales were evidenced by invoices only, no written assignments having been made. In such case, the plaintiffs, both in a prior letter of rescission and in their complaint, made a sufficient tender by offering to return all that they had received. Their tenders were as formal as the evidence of sale, and under the circumstances all that could reasonably be deemed necessary.

For the reasons stated, the judgment of the Appellate Court is affirmed in part and reversed in part. The cause is remanded to the circuit court of Cook County with directions to enter judgments for the plaintiffs as to sums advanced pursuant to said six transactions where they purchased interests in leases, deny them recovery for any other sums paid the defendants, and to proceed in a manner not inconsistent with the views expressed in this opinion.

*Affirmed in part and reversed in part,*
*and remanded, with directions.*

Mr. JUSTICE DAVIS, dissenting:

I can neither concur with the reasoning of the majority which places the transactions before us beyond the scope of section 2 of the Illinois Securities Act, nor understand their failure to consider the charge of violation of the Federal Securities Act, as alleged in count II of the complaint and assigned as error and so argued by plaintiffs. These transactions cannot be placed outside the purview of the State or Federal Securities Acts without ignoring the plain language of the statutes and the clear economic import of the transactions.

The statutes are drawn in the broadest terms:

"The word 'securities' shall mean and include * * * investment contracts, * * * participation certificates, * * * certificates evidencing shares or interest in * * *

associations, * * * or any contract * * * representing * * * evidence of * * * title to or interest in * * * property * * * of the Issuer thereof, and any oil, gas or mining lease, royalty, or deed, and interest, units or shares in any such lease, royalty, or deed * * * and any other instrument commonly known as a security * * *. The term 'sale' means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or thing of value, or any transfer or agreement to transfer, in trust or otherwise." Ill. Rev. Stat. 1953, chap. 121½, par. 97.

"(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." U. S. Code, Title 15, chap. 2A, subchap. 1, par. 77b(1).

By the breadth of the language used, our congress and legislature, as well as the legislatures of other States, sought to bring the widest variety of economic speculation within the purview of regulation, and to avoid devious and ingenious schemes to circumvent the act. See Bloomenthal, SEC Aspects of Oil and Gas Financing, 7 Wyo. L. J. 49, 55 (1953); 46 Col. L. Rev. 885.

The history of the exploitation of oil and gas rights is one of great commercial and economic development with concurring wildcat speculation and fraudulent and deceitful promotions. "(It) has been accompanied by the creation of legal interests which are, in many respects, *sui generis*.

The law relating to these interests combines familiar principles of the law of property, contracts, landlord-tenant, and tenancy-in-common; however, in no other field are they combined in the particular pattern and with the particular overtones that they are found in oil and gas law." Bloomenthal, SEC Aspects of Oil and Gas Financing, 7 Wyo. L. J. 49.

It was therefore reasonable and necessary that securities be defined so as to embrace every clear attempt to provide a type of "security" investment regardless of the peculiar legal form of the transaction. In a situation similar to the one before us, the Supreme Court of the United States laid down a succinct but useful test, applicable here. "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." (*Securities & Exchange Com.* v. *Howey Co.* 328 U.S. 293, 301.) In view of the salutary purposes of regulatory securities legislation, the term "securities" has been given a broad and liberal construction. (*Securities & Exchange Com.* v. *C. M. Joiner Leasing Corp.* 320 U.S. 344; Anno. 163 A.L.R. 1050 *et seq.*) "The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae." (*Securities & Exchange Com.* v. *Howey Co.* 328 U.S. 293.) In determining whether a particular instrument is a security within the meaning of the statute, the substance of the transaction and the relationship between the parties will control as against the form of the alleged security. *Securities & Exchange Com.* v. *Universal Serv. Assn.* (C.C.A. 7th) 106 F.2d 232; *certiorari* denied 308 U.S. 622.

I do not understand that my colleagues of the majority disagree with these principles, and indeed they admit that the instruments "on their face" are "securities" within the purview of the Illinois statute, and that the resulting transactions might lead one to believe that the money was paid for a working interest in the leases. However, I believe

that these conclusions determine the question before this court. I find no "conflict between the import of the instrument and the parties' own understanding of its terms."

The letter agreement prepared by defendant, provided: "It is also agreed that you are purchasing this interest for investment purposes only without any present intention of reselling this interest." This provision illustrates that defendants, sellers of the interests and drillers of the wells in question, recognized the transaction as a sale of a working interest, or lease, for it is certain that no one would purchase a share of the drilling cost of an oil well as an investment.

The letter agreement was artfully drafted by the defendants. It commences: "We will assign to you an undivided * * * working interest, under oil and gas leases * * * for the sum of ————." The letter continues with a usual and customary covenant as follows: "We agree to commence * * * the drilling of a well for oil and/or gas, to diligently prosecute the drilling of same and to test all possible oil formations * * * for the sum of ———— which is your share of the drilling cost of this well."

It is definite that the assignment is to be made for a certain sum, which is to be considered a share of the drilling cost. In clarification of the agreement, the letter further states that: "In the event of a producing well, it is understood and agreed that, in addition to the amount as set up above, you will pay your proportionate part of the casing, drilling in expense (etc.)."

The majority concludes that it was the agreement of the parties that only one sum was to be paid. I do not consider that this gives rise to an ambiguity, but rather believe that it expresses a reasonable understanding of the terms of the contract. The plaintiffs, who had no knowledge or experience in the oil business, clearly desired to provide venture capital which would be used for the drilling of an oil well in the anticipation that they would receive a royalty or

leasehold interest in the oil produced. The defendants-promoters, on the other hand, obtained money to finance their drilling operation in exchange for the promise of a portion of the anticipated oil profits. Clearly, this was a case of investment of money in a common enterprise by the plaintiffs with the anticipated profits to come solely from the efforts of defendants. (*Securities Exchange Com.* v. *Howey Co.* 328 U.S. 293.) The instrument was a security under the definitions of the Illinois and Federal Securities Acts. Ill. Rev. Stat. 1953, chap. 121½, pars. 96-37.18, incl.; U.S.C. Title 15, chap. 2A, subchap. I, par. 77b(1).

The form of the instrument does not in any way change the obvious practical and economic relationship of the parties. As was said by the Supreme Court of the United States in *Securities & Exchange Com.* v. *C. 'M. Joiner Leasing Corp.* 320 U.S. 344: "It is clear that an economic interest in this well drilling undertaking was what brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure. The trading in these documents had all the evils inherent in the securities transaction which it was the aim of the Securities Act to end."

It seems to me that the majority has left the world of realism when they state that "the development contract aspects of the instrument were uppermost in the minds of the parties. The only sums advanced by plaintiffs were for drilling costs—not in payment of shares in working interests." The plaintiffs invested money, with the understanding that it would be used for drilling a well; but the drilling of the well, in itself, would benefit them not an iota unless they received, for that investment, a right to share in the oil benefits reaped by the drilling efforts of the defendants. There was no provision for further payment for the acquisition of a "working share" but merely an agreement to pay certain set expenses upon production of oil.

However, even if we assume, as the majority hold that, "at best, the transfer of a working interest was incidental to the development contract," the majority conclusion is contrary to the provisions of the Illinois Securities Law which reads: "Any security given or delivered with, or as a bonus on account of, any purchase of securities or other thing of value shall be conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value." (Ill. Rev. Stat. 1953, chap. 121½, par. 97(4).) Thus any working interest given or delivered with, or as a bonus on account of payments made for drilling costs, under the act is conclusively presumed to constitute a part of the subject of such purchase and to have been sold for value and constitutes a sale within the purview of the act. *Whittaker* v. *Hall*, 226 Fed.2d 868.

There is nothing in the activities of these parties to detract from the clear language of their written agreement. The practical relationship between the parties is inescapable. The defendants had a lease and financed the exploitation of that leasehold interest by obtaining their drilling expenses in exchange for a conveyance of a working interest. Their gain was to be obtained without financial risk, by the retention of a substantial overriding interest. This was not a joint venture. There was neither provision for any control of the operation by the plaintiffs, nor for them to share in any losses of the venture beyond their initial investment.

I believe that the hyper-technical and basically impractical analysis of the majority has given rise to a simple method to circumvent the Securities Act and create a potentially powerful instrument for fraudulent promotions to bilk the public, and that the decision serves to judicially abrogate the clear language and intention of the legislature.

In my opinion, the fact that both parties sought to take advantage of the special provisions of the Internal Revenue

Code does not militate against this view. The purposes and policies behind the deductions and exemptions allowed by our Federal tax laws are far different from those which form the basis of our State and Federal "Blue Sky" laws. Even though the Congress of the United States sees fit to permit the deduction of these expenses, this circumstance neither lessens the imminent danger of fraud which our Securities Acts were designed to prevent, nor aids in their construction. The tax treatment of these expenditures by the parties should not serve to abrogate a regulatory statute of this state or nation.

SCHAEFER and KLINGBIEL, JJ., concur in the foregoing dissenting opinion.