ILLINOIS NATIONAL BANK & TRUST CO., Trustee, Plaintiff-Appellee, *v.* GULF STATES ENERGY CORPORATION *et al.*, Defendants-Appellants.— RICHARD KALLENBACH *et al.*, Plaintiffs-Appellees, *v.* GULF STATES ENERGY CORPORATION *et al.*, Defendants-Appellants.

Second District  Nos. 80-891, 80-892 cons.

Opinion filed December 17, 1981.—Rehearing denied January 27, 1982.

Bernard P. Reese, Jr., of Reese and Reese, of Rockford, for appellants.

Robert W. Gosdick, of Rockford, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Defendants, Gulf States Energy Corporation and Royal Russell, appeal the rescission of certain transactions concerning fractional interests in oil and gas leases. The Winnebago County Circuit Court held these transactions to be sales of securities within the meaning of the Illinois Securities Act (Ill. Rev. Stat. 1973, ch. 121½, par. 137.1 *et seq.*) and ordered rescission of the sales for defendants' failure to register the securities with the Secretary of State's Office, as required by the Act (Ill. Rev. Stat. 1973, ch. 121½, par. 137.5).

Plaintiffs had filed their complaints separately, but because the cases had identical issues and nearly identical facts, they were consolidated for trial and for this appeal.

Defendants contend that they are not subject to the personal jurisdiction of the Illinois Courts; that the agreements made by the parties did not constitute the purchases of securities; that the Illinois Securities Act does not apply to a contract made in Texas; and, finally, that plaintiffs failed to comply with notice and tender requirements of the Illinois Securities Act and thus cannot recover under that Act.

Defendant Gulf States Energy Corporation (Gulf States) is a Texas corporation which owned oil and gas leases in Texas. Defendant Royal Russell is Gulf States' president. Gulf States sells fractional interests in its leases to drill and develop producing wells.

Gulf States initiated the negotiations which led to the contracts in issue. Sometime in 1974 or 1975 John McGowan, a representative of Gulf States, telephoned plaintiff Richard Kallenbach and Robert Sullivan. McGowan proposed that they invest in nonproducing, working interests in wells leased by Gulf States. Each of these individuals received a prospectus through the mail from Gulf States. McGowan or another Gulf States' representative telephoned Kallenbach and Sullivan a number of times. Kallenbach entered into a number of transactions with Gulf States in spring of 1975. He purchased a 2% working interest in three oil or gas wells, Celotex Prospect Gail #5, Gail #6 and Gail #7, in March and April 1975. He later made payments on Gail #5 re-entry, Gail #6 re-entry and Gail #8 re-entry. His total investment was $17,750. Illinois National Bank and Trust Company, as trustee for a trust established by Robert Sullivan for his benefit, and as trustee for a trust established by Dorothy Sullivan, Robert's wife, for her benefit, also purchased working interests in Gulf States wells in separate transactions spread out over a number of months. As trustee for Robert Sullivan's trust it entered into transactions concerning Gail #4, Gail #6, Gail #7, Gail #8 and Gail #5. In addition, additional drilling costs were paid on Gail #7. As trustee of Dorothy Sullivan's trust the bank entered into transactions concerning Gail #4, Gail #6, Gail #7, and Gail #6 re-entry. Additional drilling costs were also paid on Gail #7 on behalf of this trust. The bank expended a total of $32,665 on behalf of the trusts.

The agreements are nearly identical, differing only in the date, location of the property, amount due, and the depth to which Gulf States agreed to drill. For the agreements regarding the re-entries Gulf States was to drill to 4800 feet, while in the other agreements the drilling depths varied from 3200 feet to 4800 feet. A representative agreement reads in part as follows:

## "AGREEMENT
## CELOTEX PROSPECT
## GAIL # 4

THIS AGREEMENT made and entered into by and between GULF STATES ENERGY CORPORATION, a Texas corporation (Hereinafter called 'Gulf States'), and Illinois National Bank & Trust Co. of Rockford, Trust No. 5424

WITNESSETH: THAT

WHEREAS, Gulf States is the owner of a certain mineral lease described as follows:

\* \* \*

WHEREAS, said lease is subject to landowners and overriding royalties aggregating 21%, and as a consequence, the full 100% working interest carries a 79% net revenue interest in production; and

WHEREAS, Gulf States is engaged in the business of exploring for and producing oil and gas and operating oil and gas properties, and proposes to assign a portion of its working interest in the Lease to Investor and drill, or cause to be drilled an oil or gas well thereon upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, it is agreed by and between the parties as follows:

1. In consideration of the payment of $2,710.00, the receipt of which is hereby acknowledged, Gulf States hereby assigns to Investor an undivided 2% working interest in the Lease. Upon completion of the oil or gas well referred to in Paragraph 2 below, Gulf States shall execute and deliver an assignment to Investor in recordable form, which assignment shall contain covenants of special warranty, be subject to this Agreement and to the terms of the Lease and all instruments by, through and under which Gulf States holds said Lease, and reflect that Investor's interest shall bear 21% of the royalties and overriding royalties burdening said Lease as stated herein.

2. Investor does hereby nominate, constitute and appoint Gulf States with full power and authority to drill, or cause to be drilled, an oil or gas well on the Lease, (herein called the 'Well'), to a maximum depth of 3,200 feet or to the Flippen Limestone, whichever comes first. Gulf States hereby accepts the $2,710.00 paid by Investor, which, together with amounts paid to Gulf States by other Investors, Gulf States accepts as payment for the drilling of the Well and hereby covenants that the drilling of the Well will begin on or before March 31, 1975 subject to events beyond the control of the operator, that such drilling will be done in a good,

workmanlike, and continuous manner to the depth of 3200 feet or the Flippen Limestone, whichever comes first. If such drilling discovers commercial production, the Well will be fully equipped and necessary storage tanks placed thereon at the expense of Gulf States. As provided in the Operating Agreement referred to in Paragraph 3 below, Investor shall bear and pay his proportionate share of the costs and expenses incurred in connection with operating, producing and reworking the Well.

3. The parties hereto specifically agree to make and enter into an Operating Agreement for the development and operating of the Lease and Well in substantially the form of the Operating Agreement attached hereto as Exhibit A. Said Operating Agreement shall provide generally that Investor gives Gulf States the following powers:

(a) To market the oil or gas that may be produced.

(b) To collect and receive from any purchaser of such oil or gas all monies that may be due the Investor from the proceeds of the sale thereof.

(c) To give all proper receipts for monies and to pay out of the proceeds from the sale of any oil or gas produced from the Lease any expenses reasonably incurred in the production and sale of such oil or gas.

(d) To pay all taxes against such oil or gas lease from the proceeds thereof.

(e) To Execute for the Investor an oil or gas purchase contract.

4. Anything to the contrary contained in this Agreement, or the proposed Operating Agreement, notwithstanding, the Investor hereby reserves his ownership in the oil or gas in place under the Lease, together with his right to contract for the sale of his own interest in said oil or gas, except that Gulf States may negotiate limited sales contracts for the sale of production for a period not longer than one year, and provided that such sales contracts may be terminated by the Investor on not more than 30 days notice.

\* \* \*

6. It is not the purpose or intention of this Agreement to create a partnership or mining partnership and neither this Agreement nor the operations hereunder shall be construed as creating such relationship.

\* \* \*

10. This Agreement is made and entered into in Dallas, Texas, and shall be governed by the laws of the State of Texas.

The parties have executed this Agreement this _____ day of _____, 1975.

GULF STATES ENERGY CORPORATION

By: _____ ss _____
President

Illinois National Bank & Trust
Co. of Rockford Trust No. 5424

_____ ss _____
Investor's Signature
✳ ✳ ✳ "

The agreements were prepared by Gulf States in Texas and mailed to plaintiffs in Illinois. Plaintiffs signed the agreements and returned them to Gulf States in Texas with a check for the appropriate amount for each agreement. Upon receipt of the checks and documents signed by plaintiffs, Royal Russell signed the agreements on behalf of Gulf States. It appears that Gulf States did in fact drill as required by each agreement and that assignments were sent plaintiffs upon completion of the wells.

Sometime in the summer of 1976, plaintiffs learned that Gulf States may have sold securities in violation of the Illinois Securities Act by failing to register them with the Securities Division of the Secretary of State's Office. On June 25, 1976, plaintiffs sent notices to defendants stating that plaintiffs considered their purchases of the interests void and that suit would be brought against defendants unless payment of the purchase price for each interest was made within 30 days. Richard Kallenbach and Mari Kallenbach (who was subsequently dismissed as a party plaintiff) filed a complaint against defendants on February 26, 1978, for return of the sums expended pursuant to the agreements. The complaint and summons were served on the Secretary of State's office on July 14, 1978. Illinois National Bank & Trust Company filed its complaint against defendant on March 7, 1978, for sums it expended on behalf of the Sullivans' trusts. Defendants were served with the complaints and summonses in Dallas, Texas. Defendants entered a special appearance in each case contesting the jurisdiction of the Illinois courts. The trial court found it had jurisdiction and required the defendants to answer. The actions were consolidated for trial which was held on July 14, 1980. The trial court subsequently found in favor of plaintiffs and ordered that plaintiffs were entitled to recover the amount of their original investments, plus interest from the date of investment at a rate of 5% per annum, minus any earnings and plus reasonable attorney fees. The court entered judgment

for Richard Kallenbach in the amount of $20,930.28, and for Illinois National Bank and Trust Company in the amount of $39,186.21.

Defendants contend that their actions did not constitute minimum contacts within the State of Illinois so as to satisfy the requirements of section 17 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 17) and of due process of law.

Section 17 provides in pertinent part:

"(1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person * * * to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

(a) The transaction of any business within this State * * *."

Section 17, the Illinois long-arm statute, reflects "a conscious purpose to assert jurisdiction over nonresident defendants to the extent permitted by the due-process clause." (*Nelson v. Miller* (1957), 11 Ill. 2d 378, 389.) The requirements of due process, as first set out in *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158, are that a nonresident defendant must "have certain minimum contacts with [the forum State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citations.]" In *Hanson v. Denckla* (1958), 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 1298, 78 S. Ct. 1228, 1240, the Supreme Court explained, "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

■■ court must consider the facts in the particular case before it to determine whether the type of activity conducted in the State is adequate to satisfy the requirements. The determination must be made according to what is fair and reasonable in the situation before the court. (*Gray v. American Radiator & Standard Sanitary Corp.* (1961), 22 Ill. 2d 432, 176 N.E.2d 761.) Although jurisdiction depends upon the facts of each case, some helpful principles have emerged from the frequent examinations our courts have made of the issue. The physical presence of a defendant in Illinois is not necessary in order for Illinois to maintain jurisdiction over him. (*First Professional Leasing Co. v. Rappold* (1974), 23 Ill. App. 3d 420, 424, 319 N.E.2d 324; *Cook Associates, Inc. v. Colonial Broach & Machine Co.* (1973), 14 Ill. App. 3d 965, 969, 304 N.E.2d 27.) Contact within the State may be accomplished by telephone and mail. (*Cook Associates v. Colonial Broach & Machine*; cf. *Schneider Corporation of America v. R. W. Borrowdale Co.* (1980), 89 Ill. App. 3d 904, 412 N.E.2d 605, and *Davis v. Nehf* (1973), 14 Ill. App. 3d 318, 302 N.E.2d 382, which

1120

required interpretation of New York's, not Illinois', long-arm statute.) Also, a single business transaction may be sufficient contact in order to establish jurisdiction. (*Coca-Cola Co. v. A. Epstein & Sons International, Inc.* (1980), 89 Ill. App. 3d 253, 257, 411 N.E.2d 917; *Morton v. Environmental Land Systems, Ltd.* (1977), 55 Ill. App. 3d 369, 370 N.E.2d 1106.) The solicitation of a contract is a transaction within the meaning of the statute even where acceptance of the contract occurred outside the forum and where it was to be governed by nonforum law. *Morton v. Environmental Land Systems, Ltd.*

■■ In the cases before us a Gulf States representative solicited investments in oil and gas wells by telephoning plaintiffs, who reside in Illinois. He then followed up his initial solicitation by sending a prospectus to each plaintiff and with further phone calls. The plaintiffs did not initiate any of the contacts. Once plaintiffs had notified Gulf States that they decided to invest in working interests in the oil and gas wells Gulf States sent agreements to plaintiffs for their signatures. Plaintiffs signed the agreements in Illinois and mailed them back to Gulf States in Texas where defendant Royal Russell signed them on behalf of Gulf States. Subsequently, Gulf States sent an assignment of production rights in a lease to each plaintiff with instructions to return the assignment to the appropriate county clerk in Texas for recording.

Defendants point out that Russell's signature, the last necessary act to execute the agreement, occurred in Texas, that the agreements stated that Texas law was to apply, that the wells were on Texas land, and that the leases were to be recorded in Texas. Formalities of contract execution, however, are not determinative of jurisdiction. (*Coca-Cola Co. v. A. Epstein & Sons International, Inc.*) Further, though Illinois courts have considered the applicability of Illinois law as one factor in determining jurisdiction (*Colony Press, Inc. v. Fleeman* (1974), 17 Ill. App. 3d 14, 308 N.E.2d 78), the fact that nonforum law may apply does not preclude the possibility that an Illinois court has personal jurisdiction over a nonresident defendant. (*Morton v. Environmental Land Systems, Ltd.*) Further, the focus of our inquiry is not how much activity occurred outside of Illinois, but whether defendants' acts in Illinois constituted minimum contacts with this State so as to subject defendants to the jurisdiction of an Illinois court. We conclude that defendant Gulf States had sufficient contacts within the State of Illinois to support jurisdiction under the long-arm statute.

■■ We reach a different conclusion with respect to defendant Royal Russell. In his capacity as president of Gulf States he signed all of the agreements involved in this appeal. He did not participate in the actual solicitation of these investments. In *Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.* (1978), 66 Ill. App. 3d 789, 383 N.E.2d 1379, it was

held that a conclusion that a foreign corporation is subject to our jurisdiction does not require the further conclusion that an employee of that corporation is also subject to our jurisdiction. "The mere fact that a corporation by which a nonresident is employed, or in which he is a stockholder is itself subject to Illinois jurisdiction does not subject that nonresident to jurisdiction." (66 Ill. App. 3d 789, 797.) Russell's only apparent connection with the agreement to purchase interests in oil and gas wells was to provide Gulf States' final acceptance. He did no soliciting in Illinois. His signature on the agreements did not constitute sufficient minimum contact with the State of Illinois for our courts to maintain personal jurisdiction over him.

The remaining arguments raised by defendants on appeal will be discussed as they affect Gulf States.

The next issue before us is whether the transactions which are the bases of this suit were the sales of securities within the meaning of the Securities Act. Ill. Rev. Stat. 1973, ch. 121½, par. 137.1 *et seq.*

The definition of "security" under that Act is broad and includes "any * * * fractional undivided interest in oil, gas, or other mineral lease, right, or royalty * * *." Ill. Rev. Stat. 1973, ch. 121½, par. 137.2—1.

A "[s]ale * * * shall include every disposition, or attempt to dispose, of a security for value. 'Sale' or 'sell' shall also include * * * an attempt or an offer to sell * * *." Ill. Rev. Stat. 1973, ch. 121½, par. 137.2—5.

Gulf States argues that the agreements do not reflect the sale of securities but payments in plaintiffs' share of the costs of drilling.

The supreme court and this court have had occasion to analyze transactions similar to those here in issue. In both cases the plaintiffs sought to rescind transactions for being sales of securities in violation of the Securities Act. Because of differences in the contracts and the understandings of the parties in the two cases, the courts arrived at opposite conclusions about the contracts they considered. These cases were decided in light of previous securities statutes, but they did not differ in substance from those applicable here.

In *Hammer v. Sanders* (1956), 8 Ill. 2d 414, 134 N.E.2d 509, *cert. denied* (1956), 352 U.S. 878, 1 L. Ed. 2d 79, 77 S. Ct. 100, plaintiffs entered into 51 transactions regarding oil leases in Indiana, Illinois and Kentucky. Forty-five transactions were evidenced by letter agreements. The court quoted a representative agreement which referred to the " 'acquisition of an interest in leases.' " (8 Ill. 2d 414, 416.) The instrument stated in pertinent part:

> " 'We will assign to you an undivided 1/128th working interest, under oil and gas leases on a block of 200 acres, located in Gibson County, Indiana, for the sum of $242.19.
>
> We agree to commence or cause to be commenced, upon the

leasehold estate described above, the drilling of a well for oil and/or gas, to diligently prosecute the drilling of same and to test all possible oil formations encountered to a depth of approximately 3000 feet, unless oil or gas in commercial quantities is discovered at a lesser depth, for the sum of $242.19, which is your share of the drilling cost of this well. We will plug the well should it be a dry hole.

In the event of a producing well, it is understood and agreed that, in addition to the amount as set out above, you will pay your proportionate part of the casing, drilling in expense, and for all equipment necessary to complete the well, as well as your proportionate part of the monthly operating expense, upon receipt of invoice. It is also understood that for any additional wells that might be drilled, you will pay your proportionate part of all costs, which costs may include the normal drilling profit of Sanders-Fye Drilling Company.' " 8 Ill. 2d 414, 417.

The court analyzed the instrument's terms with the view to determining its legal effect. It noted the instrument appeared to have two purposes: to assign, or evidence the sale of, or promise to assign, working interest in a lease for $242.19; and to evidence an agreement whereby the defendant was to drill a test well and the plaintiff was to pay $242.19 for his share of the drilling costs. It was unclear whether one or two payments were due. The ambiguity permitted consideration of extrinsic evidence, the parties' stated understanding of the contract and their performance pursuant to that understanding.

Although the contract could be read to require two separate payments of $242.19 each, only one payment was made. This was understood to be payment for drilling costs. No sums were ever paid the drilling company for a working interest as such, nor did the parties intend that anything was or ever would be due for such an interest. On their Federal tax returns the plaintiffs treated all sums advanced by them as "intangible drilling and development costs," not as payments for a leasehold interest, a capital asset. Further, the plaintiffs stated that all money expended by them was pursuant to bills for drilling. The drilling company, too, considered the money as payment for drilling costs. It told plaintiffs that if they contributed to the drilling of a well, a proportionate interest would be assigned them at no extra cost. Assuming plaintiffs acquired a security within the meaning of the statute, it was incidental to the development contract. They did not purchase it, but paid only for drilling costs. The court concluded that plaintiffs had not purchased a security within the meaning of the statute and that therefore the drilling company had not been required to comply with the provisions of the Securities Act.

This court considered an alleged sale of securities in *Meihsner v. Runyon* (1960), 23 Ill. App. 2d 446, 163 N.E.2d 236, and concluded in that case that the transactions in issue were sales of securities.

The agreements, each termed "Letter of Assignment," read in pertinent part as follows:

"KNOW ALL MEN BY THESE PRESENTS:

That the undersigned, Delbert Runyon * * * in consideration of One and no/100 ($1.00) dollars, * * * does hereby sell unto Mrs. L. T. Meihsner * * * an undivided 1/64th interest in the 7/8th or working interest in the first oil and/or gas well to be drilled upon the location upon the following described real estate, to wit:

* * *

Should oil or gas be produced in paying quantities from the well to be drilled in which the assignee herein named is a participant, then it will be necessary for the assignor * * * to equip the well with casing, pumps, tanks, pipe lines, etc., and therefore it will be necessary for each owner, as their interests may show before the assignment, to contribute their pro rata part in this additional expense of equipping and marketing the production from this well.

The assignee herein, as a participant in the drilling in the proposed oil, gas, or mineral well, will have to contribute his or her pro rata part of this additional expense of putting the producing well on production. The assignee will be notified by registered mail his or her estimated amount of the additional expense; that the assignee within the ten (10) days, will forward to the assignor, or his representative the amount due from the assignee or within the said period, notify the assignor or his representative that he or she, the assignee, does not desire to continue further as an associate in this adventure and will forfeit and surrender and assign his or her interest to the assignor for the purpose of reassignment to some individual, partnership or corporation, who will assume the obligation of the pro rata expense of equipping and marketing the production from said well.

In the event that additional wells should be drilled, the assignor will notify the assignee of his intention to drill such a well or wells by registered mail. The assignee will forward to the assignor his or her pro rata share of the estimated cost in drilling such well within ten (10) days after such notification or surrender his or her interest in said well and any further drilling operation or producing of oil in said acreage." 23 Ill. App. 2d 446, 448-50.

The court noted that to determine whether a particular instrument is a security within the meaning of the statute it must look to the substance

of the transaction and the relationship between the parties. These elements control over the form of the instrument.

The court found significant the provision that if the assignee chooses not to pay the additional expense involved of putting the well into production he is to assign the interest to the assignor for reassignment. That provision indicated that the parties considered the subject of the instruments to be interests, not merely agreements that the plaintiffs were to share in the costs of drilling wells.

The court also pointed out, that unlike the situation in *Hammer*, where all the money paid was only for drilling costs, the consideration paid was for both the interest and the drilling costs. There was no showing that all of the money paid by plaintiffs was used for drilling costs.

Reviewing the relationship between the parties, the court found that the defendant held leases and financed the exploitation of the leasehold by obtaining drilling costs from plaintiffs in exchange for a working interest. They were not joint venturers; plaintiffs had no control over the operation and there were no provisions that they would share any further losses beyond their initial investment. The court concluded that plaintiffs had acquired securities within the meaning of the statute.

In the case before us, an agreement states that "In consideration of a payment of $___ * * * Gulf States hereby assigns to Investor an undivided 2% working interest in the Lease." In the next paragraph, however, the agreement states, "Gulf States hereby accepts the $___ paid by Investor, which * * * Gulf States accepts as payment for the drilling of the Well * * *."

The two provisions suggest different intents. The former indicates a working interest is conveyed, while the latter indicates the entire consideration is payment for the drilling of the well. The ambiguity permits the examination of extrinsic evidence. *Hammer v. Sanders* (1956), 8 Ill. 2d 414, 420-21.

Richard Kallenbach testified that the Gulf States' representative told him, "He was selling an interest in oil wells or gas wells, whatever the case might be." David Bond, trust officer at the Illinois National Bank & Trust Company, testified, "In each case, we remitted funds to Gulf States Energy Corporation for 2% interests in oil well drilling, partnership-type things." Royal Russell was questioned by plaintiffs' counsel about the nature of the agreements, and the following colloquy resulted:

"Q   And were these agreements or these investments fractional and divided interests in gas and oil leases?

A   Yes.

Q   And were those leases all located in Texas?

A   Yes. Not leases, * * * they're non-working. They're working

interests, non-participating working leases. They're non-producing, working interests in wells. They're not leases.

Q   Okay. Gulf States Energy Corporation would have owned the leases?

A   Yes.

Q   And Gulf States then would have sold fractional interests in the production of these wells?

*  *  *

A   * * *They would sell fractional interests. Non-producing, working interests, is the proper term.

Q   Okay.

A   In the wells.

Q   Okay. But the object of the contract is an undivided interest in an oil and gas well, at least as far as the ordinary investor would understand?

A   Right."

▮ The understanding of the parties, then, was not that the investors were simply paying for a portion of production costs but that in each agreement they were purchasing an interest in a well. There is no indication that the parties considered the payments solely as contributions to the cost of production. As in *Meihsner v. Runyon* each transaction represented a sale of an interest. We conclude that the transactions were sales for securities within the meaning of the statute.

▮▮ We also conclude, however, that only those transactions of which there is evidence of corresponding agreements stating that payments represent purchases of interests may be rescinded. In his complaint Kallenbach only refers to purchases of working interests in Gail #5, Gail #6, and Gail #7. These agreements were attached to the complaint. These agreements were also tendered to the circuit court clerk as required by section 13 of the Security Act (Ill. Rev. Stat. 1975, ch. 121½, par. 137.13(A)). Kallenbach testified that he paid $3,870 regarding Gail #5 re-entry and $1,000 regarding Gail #6 re-entry. He also testified he spent $2,880 regarding Gail #8 re-entry and an additional $720 on Gail #7. There is no evidence that these payments were made for the purchase of working interests in oil or gas wells. Kallenbach testified that he could not recall whether additional contracts or agreements were issued in exchange for payments on the re-entries. There being no evidence that the payments on the re-entries and the $720 additional payment on Gail #7 represented the purchase of working interests, Kallenbach was not entitled to return of these payments.

Regarding First National Bank and Trust Company we find that transactions by the bank on behalf of Robert Sullivan's trust with respect

to Gail #4, Gail #5 re-entry and Gail #8 are evidenced by agreements. Payments made as consideration for these agreements are clearly recoverable under the Securities Act. The bank's transaction on behalf of Dorothy Sullivan's trust with respect to Gail #5, Gail #6 re-entry and Gail #7 are also evidenced by agreements, and these are recoverable. With respect to the other transactions regarding Gail #6, Gail #7, an additional payment on Gail #7, and Gail #5 on behalf of Robert Sullivan's trust and regarding Gail #4, Gail #6 and an additional payment on Gail #7 on behalf of Dorothy Sullivan's trust the evidence does not show that the payments made were consideration for fractional interests in oil or gas wells. No agreements regarding these payments were admitted into evidence, and the testimony regarding these is inconclusive. There being no evidence that the bank purchased securities by these payments, it cannot be reimbursed for them.

Gulf States also contends that, even if we are correct in concluding that certain of the transactions were sales of securities, they were not sales within Illinois and the Illinois Securities Act is therefore not applicable.

The definition of sale includes "every disposition, or attempt to dispose, of a security for value. [It] shall also include * * * an attempt or an offer to sell * * *." (Ill. Rev. Stat. 1973, ch. 121½, par. 137.2—5). In *Silverman v. Chicago Ramada Inn, Inc.* (1965), 63 Ill. App. 2d 96, 101, 211 N.E.2d 596, the court discussed the definition of sale within the Securities Act:

> "This definition of a sale is in itself liberal. Its obvious purpose is to exclude nothing that could possibly be regarded as a sale. Under this broad and unambiguous definition every step toward the completion of a sale would be a sale. * * * [T]he legislative intent [is] to protect the buyer at every stage of the proceedings. * * * If a seller solicited an offer to buy an unregistered security it would be a sale under the terms of the Act and the seller would be in violation of the Act."

■■ We conclude that offering securities by phone to persons in Illinois, and sending proposed agreements to them in Illinois were sales in Illinois within the meaning of the Securities Act. See *Green v. Weis, Voisin, Cannon, Inc.* (7th Cir. 1973), 479 F.2d 462, 465.

Gulf States next contends that they were not subject to the Illinois Securities Act (Ill. Rev. Stat. 1973, ch. 121½, par. 137.1 *et seq.*). They argue that both the Uniform Commercial Code (Ill. Rev. Stat. 1973, ch. 26, par. 1—101 *et seq.*) and conflict-of-law rules require the application of Texas law.

Gulf States argues that both sections 1—105(1) and 8—106 of the Code apply. (Ill. Rev. Stat. 1973, ch. 26, pars. 1—105(1), 8—106.) Section

1—105(1), it argues, permits the parties to choose which State's law is applicable. In addition, it argues, section 8—106 provides that the law of the State of the seller applies.

■■ Although section 1—105(1) provides that parties may agree on which State's laws shall govern their rights and duties, that provision is qualified with the proviso "except as provided hereafter in this Section." Section 1—105(2) provides the applicable qualifications:

> "(2) Where one of the following provisions of this Act specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) so specified:
>
> \* \* \*
>
> Applicability of the Article on Investment Securities. \* \* \*." Ill. Rev. Stat. 1973, ch. 26, par. 1—105(2).

Turning to Section 8—106, we find that it would require Texas law to apply:

> "The validity of a security and the rights and duties of the issuer with respect to registration of transfer are governed by the law (including the conflict of laws rules) of the jurisdiction of organization of the issuer." (Ill. Rev. Stat. 1973, ch. 26, par. 8—106.)

Thus, even though the parties could not employ section 1—105(1) to choose which laws were to apply, section 8—106 requires the matter to be governed by the law of the seller, which the parties had chosen in the agreements anyway. Such would be the case, that is, if additional statutes were not applicable. The legislature recognized, however, that provisions in article 8 and the Securities Act may conflict, and provided for such eventuality. Section 8—407 of the Commercial Code recognizes that the Illinois Securities Act in addition to article 8 governs transactions and securities and prevails over article 8 in event of a conflict.

> "A transaction, although subject to this Article, is also subject to 'An Act relating to the transfer of securities to and by fiduciaries and to repeal a part of an Act therein named', approved May 23, 1957, as now or as hereafter amended, and in the case of conflict between the provisions of this Article and such Act, the provisions of such Act control. Failure to comply with such Act has only the effect which is specified therein." (Ill. Rev. Stat. 1973, ch. 26, par. 8—407.)

Therefore, the registration of the Illinois Securities Act prevails and defendant was required to register the securities in Illinois. Ill. Rev. Stat. 1973, ch. 121½, par. 137.5.

Finally, Gulf States argues that notice and tender requirements of the Securities Act were not complied with by plaintiffs and that therefore they may not recover their investments on the transactions for which they

failed to give proper notice and tender. The Securities Act requires that when a purchaser of a security elects to rescind the purchase because the seller in some way violated the Securities Act the purchaser must tender to the seller or into court the securities sold (Ill. Rev. Stat. 1975, ch. 121½, par. 137.13(A)) and must give notice of the election to rescind to the seller within six months of learning that the sale is voidable (Ill. Rev. Stat. 1975, ch. 121½, par. 137.13(B)).

Regarding tender of the agreements, we have previously noted that Kallenbach only tendered to the court agreements regarding Gail #5; Gail #6 and Gail #7. Regarding the Illinois National Bank & Trust Co., we find that it tendered agreements for Gail #4, Gail #5 re-entry and Gail #8 in connection with Robert Sullivan's trust and Gail #5, Gail #6 re-entry and Gail #7 with respect to Dorothy Sullivan's trust.

As for notice, Royal Russell, president of Gulf States, testified that the corporation did receive notice of each plaintiff's election to rescind.

*Conclusion*

We conclude that the circuit court did not have jurisdiction over the person of Royal Russell, and that judgment against him must be reversed.

We conclude that against Gulf States plaintiff Richard Kallenbach is entitled to rescission of the purchase price of his securities purchased from the corporation, that being $2,710 for Gail #5, $2,710 for Gail #6, and $3,870 for Gail #7, plus 5% interest less the earnings on these interests and plus reasonable attorney fees. Plaintiff Illinois National Bank & Trust Co. may recover from Gulf States the purchase price of the securities purchased from it, that being $2,710 for Gail #4, $3,870 for Gail #5 re-entry and $4,845 for Gail #8 on behalf of Robert Sullivan's trust, and $2,710 for Gail #5, $3,870 for Gail #6 re-entry, and $3,870 for Gail #7 on behalf of Dorothy Sullivan's trust, plus 5% interest on these amounts, less the earnings on these interests and plus reasonable attorney fees.

We remand to the circuit court in order that it may make findings of the earnings made on the securities so that the reimbursements made to plaintiffs may be reduced by these amounts.

Reversed in part, modified in part and remanded with instructions.

LINDBERG and NASH, JJ., concur.