LOWELL WITTER *et al.*, Plaintiffs-Appellees, v. ART BUCHANAN *et al.*,
Defendants-Appellants.

First District (5th Division)   No. 83—2947

Opinion filed March 8, 1985.—Rehearing denied April 18, 1985.

William J. Harte, Ltd., of Chicago, and Guy E. McGaughey, Jr., of McGaughey & McGaughey, of Lawrenceville, for appellants.

Mitchell Ware and Mark E. Jones, both of Jones, Ware & Grenard, of Chicago, for appellees.

JUSTICE LORENZ delivered the opinion of the court:

This is an interlocutory appeal from an order granting a preliminary injunction in favor of plaintiffs and against defendants. In the underlying cause of action, plaintiffs alleged that defendants owned and operated an oil development business and sold securities to plaintiffs in violation of the Illinois Securities Law of 1953, the so-called "Blue Sky Law." (Ill. Rev. Stat. 1981, ch. 121½, par. 137.1 *et seq.*) Defendants admit that they are in the oil business, but deny that the transactions at issue involved "securities" within the meaning of the Act. They contend on appeal that plaintiffs failed to show any of the elements necessary to entitle them to a preliminary injunction. With respect to the substance of the Act, defendants contend that the transactions did not involve securities, that defendants did not solicit sales to plaintiffs, that one plaintiff's notice of rescission was not timely, and that plaintiffs' tender was ineffective. Defendants also contend that the trial court improperly issued and continued a temporary restraining order.

A cursory explanation of oil industry terminology may be useful before we set out the facts, but we qualify our explanation by noting that these terms have somewhat amorphous meanings, depending upon particular instruments, transactions and surrounding circumstances. Generally, in exchange for a lease which permits mineral extraction, a landowner receives a "royalty," usually one-eighth of the oil produced or one-eighth of the proceeds from the sale of that oil. The remaining interest in the oil or the proceeds, usually seven-eighths, is called the "working interest." In addition, parties may create "overriding interests," usually in connection with subleases, or they may divide royalties and working interests into fractions. (See *Lynn v. Caraway* (W.D. La. 1966), 252 F. Supp. 858, *cert. denied* (1968), 393 U.S. 951, 21 L. Ed. 2d 362, 89 S. Ct. 373, Black's Law Dictionary 1195 (5th ed. 1979) ("Royalty").) With this background, we summarize the facts as follows.

In March of 1981, plaintiff Lowell Witter met with defendant Arthur Buchanan in a truck stop near Fairfield. According to Witter, the two discussed Buchanan's oil drilling activities and Buchanan said that Witter could "get in on" his next well. Buchanan's version differs slightly; he testified that Witter asked to participate in the drilling of his next oil well. In any case, Witter wrote two checks to Buchanan Oil Company, an unincorporated association owned and operated by Arthur and Joyce Buchanan. Witter stated that the first check represented drilling costs and the second, completion costs. The parties agreed that, taken together, the checks entitled Witter to a

one-thirty-second working interest in the well.

From March of 1981 until some time in 1982, defendants entered into similar transactions with each of the plaintiffs: transactions varied only as to the location of the well, the size of the working interest, and the fractional cost of drilling and completion. By and large, plaintiffs first heard about defendants' oil development activities from mutual acquaintances, friends and relatives. In a typical transaction, a plaintiff would call defendants' office and ask what wells were available. One of the defendants would give the name of a well, and the plaintiff would send his or her drilling check, understanding that if the well produced oil, the plaintiff would then send a check for completion. Defendants called several witnesses who had entered into similar agreements with defendants. All of the plaintiffs, as well as defendants' witnesses, testified that in exchange for these payments, they received working interests in the respective wells, and they all considered their payments to be investments.

By the time this action was filed, plaintiffs had paid more than $500,000 and received interests in 21 different wells. These arrangements were not set out in writing; instead, as a well-reached completion, defendants listed owners and interests in a formal notice and sent it to the Rock Island Oil Company, which was responsible for selling the oil. Rock Island Oil Company, in turn, issued payments along with "division orders," statements which indicated the recipient's ownership in the well, expressed as a decimal portion of total oil production.

In July of 1982, plaintiffs received bills for operating expenses from defendants, although plaintiffs testified that defendants had never mentioned operating costs. Also during the summer of 1982, several plaintiffs noticed that the decimal numbers listed on their division orders were lower than the fractional interests they had purchased. Defendant Arthur Buchanan testified that the numbers did not match because plaintiffs' interests were computed after royalties were paid, and because their working interests were subject to a variety of "overrides." Buchanan stated further that he retained all of the remaining working interests because he paid whatever excess expenses were not covered by others' payments. Defendant Joyce Buchanan stated that she received an overriding interest in each well because the landowner leased the mineral rights to her and she subleased those rights to the Buchanans' oil business. The Buchanans' son also received overriding interests in some of the wells. Plaintiffs testified that they were not told that the Buchanans retained overriding interests, and they were not told that Arthur Buchanan acquired

working interests without concurrent payment for drilling and completion.

Plaintiffs Rock and Virginia Kreis testified that they contacted Arthur Buchanan on November 16, 1981, and said that they wanted to make an investment for their children. Arthur Buchanan told them that "Jones 14" was a "good well," and they sent Buchanan $11,250. Plaintiffs introduced a report which indicated that defendants knew almost two weeks earlier that Jones 14 was dry. Plaintiff Norman Freise paid completion costs in Jones 14 on November 16, 1981, even though plaintiffs were supposed to pay completion costs only when a well proved productive. Plaintiff Witter paid for drilling costs in Jones 14 nearly four months later.

Plaintiff Witter admitted that he acted as defendants' agent in some of the sales. He further admitted that he asked defendant Joyce Buchanan in December of 1981 whether interests in a well known as "Karl Koertege" had been registered. According to Witter, Joyce Buchanan responded that defendants would file a report seeking exemption of the well from the securities law. Witter stated that in a later conversation, Joyce Buchanan asked him not to date certain checks, because defendants were in the process of filing for the exemption.

Plaintiffs introduced an exemption report for the Karl Koertege well, filed by defendants with the Secretary of State under the "limited offering" provision, section 4H of the Illinois Securities Law of 1953; that provision exempts oil and gas interests from registration as securities so long as the interest is divided among 35 or fewer investors and the total investment does not exceed $50,000. (See Ill. Rev. Stat. 1981, ch. 121½, par. 137.4(H).) Defendants do not dispute that several investors' names were omitted from the report and that the total amount of the investment was understated.

In late August of 1982, Amos Oil Company notified certain plaintiffs that defendants had sold and Amos Oil had purchased three of the wells in which plaintiffs owned interests. In late September 1982, plaintiffs' counsel received certification from the Secretary of State that defendants had not registered as securities dealers, and that only one exemption report had been filed by defendants. On October 8, 1982, plaintiffs' counsel sent a letter by certified mail advising defendants that plaintiffs elected to rescind the transactions under the securities law.

On October 12, 1982, plaintiffs learned that defendants were negotiating the sale of additional wells in which plaintiffs owned interests. Also on October 12, plaintiffs filed their complaint in the circuit court of Cook County alleging fraud, misrepresentation, conversion

and violation of the Illinois Securities Law of 1953; they sought temporary and permanent injunctive relief, an accounting, rescission, and punitive damages. Plaintiffs notified defendants by mail on Friday, October 22, that they would seek a temporary restraining order (TRO) on Monday, October 25. After an *ex parte* hearing, the circuit court granted the motion and restrained defendants from transferring their interests in any of the subject wells.

Defendants appeared on October 29, 1982, through their attorney, Gerald Mayberry. Counsel for plaintiffs and defendants agreed to several extensions of the TRO from November of 1982 through January of 1983, and jointly represented to the court that the matter would be settled. However, attorney Guy E. McGaughey, Jr., entered an appearance on behalf of defendants on January 13, 1983, and was granted leave to appear on January 17, 1983. At that time, the court ordered McGaughey, Mayberry and defendants to appear and clarify who was representing defendants. On January 28, Mayberry requested leave to withdraw as defendants' attorney, and the court granted the motion. Later, during plaintiffs' rebuttal, the court permitted plaintiffs' attorney, Mitchell Ware, to testify that he had tendered assignments of plaintiffs' interests to attorney Mayberry in December of 1982.

Many, many additional facts are argued and reargued by counsel in their briefs. Our review indicates that too many of these "facts" are not of record, and too many of the "facts" which appear in the record appear only as argument by counsel, and not as the testimony of witnesses. We recall our late colleague Justice Wilson's words when confronted with a similar situation:

> "We emphasize that we disregard irrelevant and inflammatory material in reaching our determination of the issues presented. Nevertheless, some of the comments and argument in appellant's brief are inaccurate, highly improper and far exceed the bounds of zealous advocacy. We express our disapproval to remind counsel that the first purpose of the appellate brief is to inform the court of the facts, objectively, and then to persuade the court of a particular application of the law to the facts." *In re Marriage of Milovich* (1982), 105 Ill. App. 3d 596, 599, 434 N.E.2d 811.

The trial court heard testimony from 44 witnesses on 13 separate days over the course of several months; the transcript is over 1,500 pages long, and more than 500 exhibits were introduced into evidence. On November 9, 1983, the trial court found that defendants had violated the Illinois Securities Law of 1953, and granted plain-

tiffs' motion for a preliminary injunction. The court enjoined defendants from transferring their interests in the subject wells, and required that proceeds from the sale of oil therefrom be placed in escrow. The order provided that plaintiffs' portion of operating expenses would be paid from the escrow pending a final disposition. Defendants filed a timely notice of appeal, and we have jurisdiction to consider this interlocutory appeal pursuant to Supreme Court Rule 307(a)(1) (87 Ill. 2d R. 307(a)(1)).

OPINION

■■ The thrust of defendants' appeal is that plaintiffs have shown none of the elements necessary to entitle them to a preliminary injunction. Generally, a party seeking an injunction must show an ascertained right in need of protection, a likelihood of success on the merits, and inadequate remedy at law and irreparable injury. (*People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 269, 441 N.E.2d 1328.) The decision to grant or deny a preliminary injunction is committed to the sound discretion of the trial court, and ordinarily, a reviewing court will not disturb the decision unless an abuse of discretion appears. (*Lonergan v. Crucible Steel Co. of America* (1967), 37 Ill. 2d 599, 612, 229 N.E.2d 536.) However, the rule of discretion is predicated upon the theory that a preliminary injunction is not a final adjudication of the merits; where such an order effectively decides the merits of the case, a reviewing court should consider whether the trial court's findings are against the manifest weight of the evidence, and whether the trial court erred legally. See *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 440 N.E.2d 117.

The parties' arguments in this court create some ambiguity concerning the proper scope of review. Defendants note that the trial judge did not sign the findings of fact, and they imply that the court therefore made no findings. Of course, under the abuse of discretion standard, the relevant factual inquiry at the trial level is whether plaintiffs have established a fair question of *prima facie* entitlement to preliminary relief (see *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524-25, 440 N.E.2d 117, quoting *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33, 380 N.E.2d 1106) and findings of fact, as such, are unnecessary. Contrary to defendants' implication, the trial court expressly incorporated the findings of fact into its order. Plaintiffs, on the other hand, quizzically suggest that the facts should be measured by the higher standard, whether they are against the manifest weight of the evidence.

Notwithstanding plaintiffs' willingness to shoulder the heavier burden, we believe that the appropriate standard of review is the abuse of discretion standard ordinarily applied to preliminary injunctions. The findings in support of the preliminary injunction do not amount to a final adjudication of the rights of the parties: at the conclusion of this appeal, jurisdiction will revest in the trial court, and that court will be free to alter or amplify its findings and to grant such final relief as is warranted by law. Accordingly, our review focuses upon whether the trial court abused its discretion when it concluded that plaintiffs established a fair question of *prima facie* entitlement to a preliminary injunction.

■ The crux of this dispute is whether plaintiffs are likely to succeed on the merits, and so we first consider the substantive issues arising from the Illinois Securities Law of 1953 (the Act) (Ill. Rev. Stat. 1981, ch. 121½, par. 137.1 *et seq.*). The Act regulates sellers of "securities." Defendants posit that plaintiffs paid for the drilling and completion costs of the oil wells, and did not purchase "securities" within the meaning of the Act. In addition, defendants argue that they did not violate the Act because there was no "solicitation," and that recovery should be barred because plaintiffs' notice of rescission was untimely and their tender was insufficient.

Section 2.1 of the Act defines "security" as:

"*** any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, investment fund share, face-amount certificate, voting-trust certificate, *fractional undivided interest in oil, gas, or other mineral lease, right, or royalty*, option, put, call, privilege, indemnity or any other right to purchase or sell a contract for the future delivery of any commodity offered or sold to the public and not on a registered contract, market, or, in general, any interest or instrument commonly known as a security, or any certificate of deposit for, certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 121½, par. 37.2—1.)

Defendants maintain that the documentary and testimonial evidence indicates that plaintiffs paid for drilling, completion and operating expenses. Defendants rely upon *Hammer v. Sanders* (1956), 8 Ill. 2d 414, 134 N.E.2d 509, *cert. denied* (1956), 352 U.S. 878, 1 L. Ed. 2d

79, 77 S. Ct. 100, and *Burke v. Zipco Oil Co.* (1974), 19 Ill. App. 3d 909, 312 N.E.2d 399, for the proposition that such payments do not constitute securities.

In *Hammer v. Sanders,* our supreme court considered 51 transactions in the context of the Illinois Securities Law of 1919 (See Ill. Rev. Stat. 1953, ch. 121½, par. 96 *et seq.*) Forty-five of these transactions were evidenced by written contracts; the typical contract provided that defendants would assign an undivided one one-hundred-twenty-eighth working interest in specified oil and gas leases in exchange for $242.19, and provided further that defendants would drill a test well for which plaintiffs would pay $242.19. The court stated:

> "Nothing further appearing, it would seem that this sale of a ¹/₁₂₈th working interest in the leases for the sum of $242.19 amounted to the sale of an 'interest' in an oil lease within the purview of the Illinois statute and hence a 'security.' (Cf. *Securities Exchange Com. v. Joiner Corp.* 320 U.S. 344; *People v. Craven,* 219 Cal. 522; *Commonwealth v. Yaste,* 166 Pa. Super. 275). However, while the terms of the instrument apparently call for the payment of two identical sums, just one sum was actually paid. And this was regarded by the parties as the only amount due. Thus, Hammer did not pay $242.19 for the undivided ¹/₁₂₈th working interest and another $242.19 for drilling costs. Rather, he paid $242.19 only, and by his own admission this was for drilling costs alone, as provided in the third paragraph of the instrument." (8 Ill. 2d 414, 420, 134 N.E.2d 509.)

The court concluded that the contracts were not covered by the statute because the plaintiffs paid only for drilling costs, and the transfer of interest was merely incidental. (*Hammer v. Sanders* (1956), 8 Ill. 2d 414, 422, 134 N.E.2d 509.) Notably, the majority held that the transfers of six additional working interests, evidenced by invoices rather than contracts, were securities. 8 Ill. 2d 414, 424.

Justice Davis, writing for the minority, argued that the justices in the majority ignored the economic reality of the transactions. (*Hammer v. Sanders* (1956), 8 Ill. 2d 414, 425, 134 N.E.2d 509 (Davis, J., dissenting).) He reasoned:

> "[D]efendants, sellers of the interests and drillers of the wells in question, recognized the transaction as a sale of a working interest, or lease, for it is certain that no one would purchase a share of the drilling cost of an oil well as an investment.

\* \* \*

The plaintiffs invested money, with the understanding that it would be used for drilling a well; but the drilling of the well, in itself, would benefit them not an iota unless they received, for that investment, a right to share in the oil benefits reaped by the drilling efforts of the defendants." (8 Ill. 2d 414, 428-29 (Davis, J., dissenting).)

The dissent predicted that the majority's "hyper-technical" analysis would foster circumvention of the law and aid fraudulent promotions. 8 Ill. 2d 414, 430 (Davis, J., dissenting).

It is impossible to say whether Justice Davis' prediction was correct, but it is clear to us that *Hammer v. Sanders* has been honored more in its avoidance than in its acceptance. The single case which seems to accept the majority view, *Burke v. Zipco Oil Co.* (1974), 19 Ill. App. 3d 909, 312 N.E.2d 399, actually decided a different issue. In *Burke*, defendants conceded that working interests in oil and gas wells were securities, but claimed that the transactions in question were exempt under the limited offering provision, section 4(H) of the Act (see Ill. Rev. Stat. 1973, ch. 121½, par. 137.4(H)), and the trial court agreed. Plaintiffs argued on appeal that defendants forfeited the exemption by misstating the price of the working interest in the 4(H) report. Defendants had listed the "drilling cost" as the price for the working interest, and plaintiffs argued that completion costs and operating expenses should have been included in the price. The issue in *Burke*, then, was "what constitutes the *price* of a working interest in an oil or gas well *for the purpose of filing the report required by section 4H.*" (Emphasis added.) *Burke v. Zipco Oil Co.* (1974), 19 Ill. App. 3d 909, 911, 312 N.E.2d 399.

The *Burke* court noted that the development costs of a well were unknown at the time the 4(H) report was required to be filed, and so inclusion of such costs would place an impossible burden on sellers of oil interests generally. (19 Ill. App. 3d 909, 913.) Although the *Burke* court cited *Hammer* as support, it acknowledged that *Hammer* suggested a more extreme conclusion, that drilling costs should also have been excluded from the price of the working interest. However, because the parties did not argue the matter, the *Burke* court made no decision concerning it. (19 Ill. App. 3d 909, 912-13.) In our view, *Burke* scarcely endorses the reasoning of *Hammer v. Sanders*, and does not support defendants' position in this case at all.

Subsequent Illinois cases have distinguished *Hammer*. The issue in *Meihsner v. Runyon* (1960), 23 Ill. App. 2d 446, 163 N.E.2d 236, was whether letters of assignment sold by the defendant were securities. The letters recited that in consideration of $1.00, defendants

would assign to plaintiffs a one-sixty-fourth working interest in a particular well; the letters provided further that plaintiffs would contribute a *pro rata* share of development expenses. The *Meihsner* court reasoned, "[t]he thing that gave to these instruments apparent value and induced their purchase was the hope of economic gain from oil development and not the burning desire to help pay the costs of drilling oil wells." (23 Ill. App. 2d 446, 454.) Distinguishing *Hammer v. Sanders*, the court stated:

> "In the Hammer case the instruments provided for the payment of one sum for a working interest and another sum to defray part of the cost of drilling a test well on a given lease, and the court found that the consideration for the working interest was never paid and that, therefore, there was no money to be recovered. The court further found that the plaintiff, Hammer, admitted that the amount which he paid was for drilling costs alone ***.
>
> In the instant case, one amount was paid for a working interest and the drilling costs and there is nothing in the record that indicates that the plaintiff [*sic*] understood that they were buying the instruments and paying their money merely for the privilege of participating in the costs of drilling oil wells, and there is no showing in the instant case that all of the money paid to the defendant by the plaintiffs was used for drilling costs as was found to be the situation in the Hammer case." (23 Ill. App. 2d 446, 455, 163 N.E.2d 236.)

The court held that the letters were securities.

In *Illinois National Bank & Trust Co. v. Gulf States Energy Corp.* (1981), 102 Ill. App. 3d 1113, 429 N.E.2d 1301, this court again distinguished *Hammer v. Sanders* and held that the transfer of interests in an oil venture constituted securities. In *Gulf States*, as in *Hammer*, the contract provided for one payment in exchange for a working interest, and an identical payment for drilling costs. In *Gulf States*, too, only one sum was actually paid. The court looked to the testimony and concluded: "The understanding of the parties, then, was not that the investors were simply paying for a portion of production costs but that in each agreement they were purchasing an interest in a well. There is no indication that the parties considered the payments solely as contributions to the cost of production." 102 Ill. App. 3d 1113, 1125, 429 N.E.2d 1301.

It appears that this court has limited the application of *Hammer v. Sanders* to cases in which the plaintiff *admits* that payment was for drilling costs and not for working interests. The supreme court it-

self provided support for this approach by distinguishing between the transactions evidenced by written contracts and those evidenced by invoices only. (See *Hammer v. Sanders* (1956), 8 Ill. 2d 414, 424, 134 N.E.2d 509.) The facts before us reveal no written contracts which would compel a narrow interpretation of the parties' oral agreements, and plaintiffs testified to their understanding that the payments for drilling and completion costs, taken together, were consideration for the transfer of the working interests. Accordingly, we distinguish *Hammer v. Sanders* on the ground that in this case, the trial court was justified in finding that plaintiffs paid for working interests.

This entire approach to distinguishing working interests from payments for drilling costs, however, seems to us artificial, for it places a premium upon the subjective and emphasizes form at the expense of substance. In addition, one could argue that this distinction offends *stare decisis* by adopting the dissent in *Hammer v. Sanders*. Therefore, we seek a more principled basis to determine the character of the instant transactions.

One of the primary drafters of the Illinois Securities Law of 1953, Samuel H. Young, long ago suggested such a principle, which not only offers useful guidance in deciding what is and is not a security, but also provides a defensible treatment of *Hammer v. Sanders*. (See Young, *Exemptions From Registration Under the Illinois Securities Law of 1953*, 1961 U. Ill. L.F. 205.) Young pointed out:

> "[T]he definition of the term 'securities' in the 1953 Law was taken from the Federal Securities Act of 1933, and therefore decisions under that Act should have considerable weight with the judiciary. These decisions include such broad interpretations of the term 'securities' as are found in the cases of *SEC v. C. M. Joiner Leasing Corp.* and *SEC v. W. J. Howey Co.*, which hold that the phrase 'investment contract' includes the sale of an interest in any type of profit-seeking venture whereby the investor transfers his capital to the promoters, and looks to the promoters for the success of his investment." (1961 U. Ill. L.F. 205, 206.)

Concerning *Hammer*, Young suggested:

> "In view of the express wording in the 1953 Law defining 'security' to include an 'investment contract,' as well as a 'fractional undivided interest in oil, gas, or other mineral lease, right or royalty,' and defining the term 'issuer' with respect to 'fractional interests in oil, gas, or other mineral lease, right, or royalty,' it is difficult to see how the Illinois Supreme Court would reach the same result under the 1953 Law." (1961 U. Ill.

L.F. 205, 207.)

We believe that these comments are well taken, and fully consistent with the longstanding practice of Illinois courts in harmonizing the 1953 Act with Federal securities law. (See, *e.g., Anvil Investment Limited Partnership v. Thornhill Condominiums, Ltd.* (1980), 85 Ill. App. 3d 1108, 407 N.E.2d 645; *Norville v. Alton Bigtop Restaurant, Inc.* (1974), 22 Ill. App. 3d 273, 317 N.E.2d 384.) We conclude that the *Hammer* court's narrow interpretation applied only to the 1919 Law, and we look to the broader principles of securities law to interpret the 1953 Act.

The United States Supreme Court entered the field of unconventional interests in *Securities & Exchange Com. v. C. M. Joiner Leasing Corp.* (1943), 320 U.S. 344, 88 L. Ed. 88, 64 S. Ct. 120. There, the defendant subdivided a large oil lease into small leasehold parcels, and sold the small leaseholds along with an assurance that the defendant would drill a well. The *Joiner* court reasoned that the broad definition of "security" should be construed to carry out the dominant legislative purpose, and held that the Act reached novel, uncommon or irregular devices if they came within such descriptive terms as "transferable share," "investment contract," or "any interest or instrument commonly known as a 'security.' " (320 U.S. 344, 350-51, 88 L. Ed. 88, 93, 64 S. Ct. 120, 123.) The court analyzed the transaction thus:

> "[T]he acceptance of the offer quoted made a contract in which payments were timed and contingent upon completion of the well and therefore a form of *investment contract* in which the purchaser was paying both for a lease and for a development project.
>
> It is clear that an economic interest in this well-drilling undertaking was what brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure. The trading in these documents had all the evils inherent in the securities transactions which it was the aim of the Securities Act to end." 320 U.S. 344, 349, 88 L. Ed. 88, 92, 64 S. Ct. 120, 122. (Emphasis added.)

In *Securities & Exchange Com. v. W. J. Howey Co.* (1946), 328 U.S. 293, 90 L. Ed. 1244, 66 S. Ct. 1100, the Supreme Court refined the definition of "investment contract." The *Howey* court chose a flexible principle, "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." (328 U.S. 293, 299, 90 L. Ed. 1244, 1250, 66 S. Ct. 1100, 1103.) "The test is whether the scheme involves

an investment of money in a common enterprise with profits to come solely from the efforts of others." (328 U.S. 293, 301, 90 L. Ed. 1244, 1251, 66 S. Ct. 1100, 1104.) A number of Federal courts have applied this flexible test and held that oil and gas interests, similar to the ones we consider here, were securities. See, *e.g.*, *Parvin v. Davis Oil Co.* (9th Cir. 1975), 524 F.2d 112; *Nor-Tex Agencies, Inc. v. Jones* (5th Cir. 1973), 482 F.2d 1093; *Gilbert v. Nixon* (10th Cir. 1970), 429 F.2d 348; *Lynn v. Caraway* (W.D. La. 1966), 252 F. Supp. 858; *Repass v. Rees* (D. Colo. 1959), 174 F. Supp. 898 (criticizing *Hammer v. Sanders*).

We hold that the instant transactions were sales of securities within the meaning of the Illinois Securities Law of 1953. Plaintiffs transferred capital to defendants in connection with common enterprises, namely, the oil wells; defendants decided when, where and how to drill, they directed the tools of production, and they managed the personnel. Defendants held out to plaintiffs an expectation of profit in the form of working interests which entitled plaintiffs to a fractional share of the proceeds from the sale of any oil. Manifestly, the scheme involved both investment contracts and fractional undivided interests in oil rights.

We note that our interpretation is consistent with the overwhelming weight of authority in other jurisdictions which have considered the matter. (See *Oil Lease Service, Inc. v. Stephenson* (1958), 162 Cal. App. 2d 100, 327 P.2d 628; *Trustees of the Protestant Episcopal Church v. Equitable Trust Co.* (1942), 26 Del. Ch. 427, 24 A.2d 327; *O'Neill v. State* (Fla. App. 1976), 336 So. 2d 699; *State v. Walters* (1953), 244 Iowa 1253, 58 N.W.2d 4, *cert. denied* (1954), 346 U.S. 940, 98 L. Ed. 427, 74 S. Ct. 380; *Caldwell v. Trans-Gulf Petroleum Corp.* (La. 1975), 322 So. 2d 171; *People v. Blankenship* (1943), 305 Mich. 79, 8 N.W.2d 919; *Prince v. Heritage Oil Co.* (1981), 109 Mich. App. 189, 311 N.W.2d 741 (interpreting successor statute); *State v. Golden* (1943), 216 Minn. 97, 12 N.W.2d 617; *Gales v. Weldon* (Mo. 1955), 282 S.W.2d 522; *Hummel v. Kranz* (N.D. 1964), 126 N.W.2d 786; *State ex rel. Day v. Petco Oil & Gas, Inc.* (Okla. 1977), 558 P.2d 1163; *Commonwealth v. Yaste* (1950), 166 Pa. Super. 275, 70 A.2d 685; *State v. Pullen* (1937), 58 R.I. 294, 192 A. 473; *Kadane v. Clark* (1940), 135 Tex. 496, 143 S.W.2d 197; see also *Upton v. Trinidad Petroleum Corp.* (5th Cir. 1981), 652 F.2d 424 (interpreting Alabama law). But see *Smith v. Wedding* (Ky. 1957), 303 S.W.2d 322; *State v. Allen* (1939), 216 N.C. 621, 5 S.E.2d 844.) We have relied upon these well reasoned opinions to guide us through the morass of arguments urging formal distinctions which made no difference. The cases speak elo-

quently of the need to protect credulous investors from those in the oil industry who may be less than scrupulous.

The Illinois Securities Law of 1953 places strict duties upon sellers of securities. Section 5 of the Act states that all securities must be registered prior to sale unless the securities or the transactions are exempt. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.5.) Section 12 of the Act provides, *inter alia*:

"It shall be a violation of the provisions of this Act for any person:

A. To sell any security except in accordance with the provisions of this Act;

B. To deliver to a purchaser any security required to be registered \*\*\* unless accompanied or preceded by a prospectus that meets the requirements of the pertinent subsection \*\*\*;

C. To act as a dealer, salesperson or investment adviser unless registered as such \*\*\*;

D. To fail to file with the Secretary of State any application, report or document required to be filed under the provisions of this Act \*\*\*;

E. To make, or cause to be made, (1) in any application, report or document filed under this Act \*\*\* any statement which was false or misleading with respect to any material fact \*\*\*;

F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchase or seller thereof;

G. To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

\* \* \*." (Ill. Rev. Stat. 1981, ch. 121½, par. 137.12.)

Section 13 provides that every sale of securities violative of the Act is voidable at the election of the purchaser. Ill. Rev. Stat. 1981, ch. 121½, par. 137.13.

●3 The trial court found that defendants violated the Act, and the evidence supports the relevant findings. The defendants were not registered as dealers, and the securities were not registered at all. No prospectus was delivered to any plaintiff. In the one report filed under section 4(H) seeking exemption, defendants materially misstated the number of investors and the amount invested. Defendants advised certain plaintiffs that the Jones 14 well was "good" when they knew

or should have known that it was dry, and defendants retained interests in all of the wells without disclosing to plaintiffs the nature, size, or consideration paid for such interests. It is abundantly clear that plaintiffs will be entitled to rescission unless there is a meritorious defense.

Defendants interpose three matters of an affirmative nature by which they seek to avoid rescission. First, they argue that the sales at issue were "unsolicited," and for that reason, not prohibited by the Act. Defendants point to testimony that plaintiffs initiated contact with defendants, and they cite *Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358, 187 N.E.2d 274, *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 323 N.E.2d 73, and *Froehlich v. Matz* (1981), 93 Ill. App. 3d 398, 417 N.E.2d 183. We reject defendants' argument and find the cases distinguishable.

■ The *Froehlich* court found that judgment was properly entered in favor of two defendants who had participated neither in the sales of securities nor in the management of the corporation. (93 Ill. App. 3d 398, 406, 408.) *Home Indemnity* and *Martin* addressed "solicitation" in the narrow context of the section 4(N) exemption, which applied only to registered dealers. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.4(N); *Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358, 368; *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 244.) Defendants at bar do not and could not suggest that the instant sales were exempt under section 4(N). Their participation in both the sales of securities and the management of the business is beyond question: they "owned" the interests, "created" and "issued" fractional shares and investment contracts, "controlled" the business, and actually made the "sales" at hand. (See Ill. Rev. Stat. 1981, ch. 121½, pars. 137.2—2(4), 137.2—4 and 137.2—5.) These activities are subject to the Act without reference to solicitation.

■ Next, defendants argue that plaintiff Witter's rescission was not timely. Defendants maintain that Witter knew the securities were unregistered in December of 1981, but he did not rescind until October of 1982. We believe that defendants' argument is flawed as to the law and the facts.

Section 13(B) of the Act requires notice of rescission within six months of the purchaser's knowledge of voidability. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13(B).) Voidability is a mixed question of law and fact, about which a purchaser usually receives knowledge from an attorney; where the seller contests the legality of the sale, the purchaser has six months after a judicial determination of voidability in which to rescind the sale. (*Frendreis v. Financial Concepts, Ltd.*

(1982), 106 Ill. App. 3d 438, 442-43, 435 N.E.2d 1304.) Accordingly, plaintiffs cannot be said to have knowledge of voidability so long as this case is pending.

Further, the record fails to support defendants' position. Witter's testimony, upon which defendants rely, was that he asked defendants whether a certain well was registered, and defendants assured him that they were in the process of seeking exemption from registration. This hardly amounts to an admission of knowledge that the securities were unregistered, let alone knowledge that the sales were voidable. The record indicates that Witter acquired his knowledge of registration status and belief of voidability at the same time as the other plaintiffs, when their attorney received certification from the Secretary of State in September of 1982. All of the plaintiffs gave notice of their election to rescind several weeks thereafter, and we hold that the notice was timely.

■ Finally, with respect to the likelihood of success on the merits, defendants argue that plaintiffs tender of the securities was insufficient. Section 13(A) conditions liability under the Act "upon tender to the seller or into court of the securities sold." (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13(A).) Defendants maintain that some plaintiffs offered to sell some of their working interests to Pyramid Oil Production after this suit was filed, indicating to defendants that plaintiffs did not intend a full tender. Defense counsel also accuses plaintiffs' attorney of false testimony concerning tender. Plaintiffs posit that tender was made and continues, and that the letter was not inconsistent with tender. The record supports plaintiffs' version of events.

While representing plaintiffs, attorney Mitchell Ware testified that he had negotiated a settlement with attorney Gerald Mayberry, then counsel for defendants, and on December 8, 1982, Ware tendered assignments of the working interests to Mayberry. Mayberry told him that defendants had not obtained sufficient funds, and asked Ware to hold the assignments. Ware and Mayberry agreed to several extensions of the TRO from November of 1982 through January of 1983, and jointly represented to the court that the matter would be settled. The letter from Ware to Pyramid Oil, upon which defendants rely, refers to "settlement of the underlying cause of action," and "certain wells which could be the subject of a sale from Arthur Buchanan to your company." Because defendants were subject to an order restraining them from transferring their interests, Ware's letter must have contemplated settlement.

On January 17, 1983, the trial court granted attorney Guy E. McGaughey, Jr., leave to appear on behalf of defendants; the court

then ordered defendants, Mayberry and McGaughey to appear together in order to clarify who was representing defendants. On January 28, 1983, Mayberry requested leave to withdraw as defendants' attorney, and the court granted the motion. It appears that Mayberry was unaware of his clients' opposition to the settlement until after McGaughey appeared. Absent any contrary indication to plaintiffs or their counsel, plaintiffs were entitled to treat Mayberry as defendants' attorney. Therefore, we hold that plaintiffs' tender of assignments to Mayberry in December was effective, and was not rendered ineffective by virtue of their letter written in contemplation of settlement. We find nothing in the record which is inconsistent with plaintiffs' ability and willingness to return their working interests to defendants in exchange for the consideration which they paid, plus interest and attorney fees. (See *Bultman v. Bishop* (1983), 120 Ill. App. 3d 138, 143, 457 N.E.2d 994.) Given the current antagonism between the parties, however, we suggest that tender to the trial court would be appropriate.

As to the aspersions cast by defense counsel, we call back to mind Justice Wilson's remark:

> "We are impelled to again remind counsel that our time is not well spent in addressing spurious issues. Nor are we impressed with distorted presentations of the facts and disparaging remarks.
>
> *** Apparently, counsel believes this brand of off-record rhetoric is persuasive; we emphatically disagree." (*In re Marriage of Milovich* (1982), 105 Ill. App. 3d 596, 614 n.4, 434 N.E.2d 811.)

We note that the trial court heard all of the testimony and believed plaintiffs' version of events.

In summary to this point, we conclude that the trial court was justified in finding that plaintiffs are likely to succeed on the merits. Defendants sold securities in violation of the Illinois Securities Law of 1953; plaintiffs timely rescinded the transactions, and properly tendered the securities back to defendants. We now consider defendants' arguments concerning the need to protect plaintiffs' ascertained rights, the adequacy of legal remedies, irreparable harm, and the scope of the injunction. Because we view defendants' arguments on the remaining issues as variations on a single theme, we consider them together.

Defendants contend that plaintiffs failed to show a clearly ascertained right to restrain transfer of defendants' interests; that plaintiffs have adequate remedies at law in rescission and accounting; and

that plaintiffs will not be irreparably harmed if defendants are allowed to transfer their interests. In addition, defendants argue that the preliminary injunction changed the relative positions of the parties by constricting defendants' personal oil money, and allowing only plaintiffs' operating costs to be released. Defendants cite no authority for these contentions.

Plaintiffs respond that the preliminary injunction is reasonable in view of defendants' conduct and the nature of the action. Because the Act expressly provides for injunctive relief, they argue, an injunction may issue upon the bare showing that defendants violated the Act. Plaintiffs argue further that defendants wrongfully took a portion of each plaintiffs' interest in the respective wells, and so defendants' transfer of *their* interest to a bona fide purchaser constituted a transfer of a portion of plaintiffs' interests. In order to protect plaintiffs' interests pending outcome, the trial court properly restrained defendants from further alienating the subject matter of the dispute.

■ We reject plaintiffs' position that the instant injunction was authorized by the Act upon a bare showing of violation. Plaintiffs rely upon *People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 441 N.E.2d 1328. Our supreme court recently cited *Miller* for the proposition that a public official may obtain an injunction to enforce a remedial statute based on a minimal showing, but the court held that where a statute only generally authorizes equitable remedies, a private litigant must plead the traditional elements of an injunction. (*Sadat v. American Motors Corp.* (1984), 104 Ill. 2d 105, 112-13, 470 N.E.2d 997.) The Securities Act authorizes the circuit court, upon a proper showing, to enjoin continuing violations or enforce compliance with the Act. (Ill. Rev. Stat. 1981, ch. 121½, par. 137.13(G)(1).) We do not interpret the Act to eliminate the requirement that a litigant must plead the traditional elements of an injunction, especially where, as here, the injunction is aimed at protecting the status quo between litigants rather than preventing ongoing violation. However, we agree with plaintiffs that the injunction was justified on the traditional bases.

The trial court found that defendants "took" percentages of each plaintiff's interest, and that defendants transferred a portion of plaintiffs' interests when they sold their interest to the Amos Oil Company. Defendants admitted during the hearing that they had negotiated with other companies for the sale of additional wells in which plaintiffs had invested. We believe plaintiffs showed ascertained rights in need of protection.

■ The standards for adequacy of legal remedies and irreparable

harm are well settled. "For there to be an adequate remedy at law which will deprive equity of its power to grant injunctive relief, the remedy 'must be clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy.' " (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 549, 370 N.E.2d 223, quoting *K.F.K. Corp. v. American Continental Homes, Inc.* (1975), 31 Ill. App. 3d 1017, 1021, 335 N.E.2d 156.) Irreparable harm does not mean injury beyond compensation in damages; rather it indicates transgressions of a continuing nature. (*SSA Foods, Inc. v. Giannotti* (1982), 105 Ill. App. 3d 424, 428, 434 N.E.2d 460.) It is clear to us that the "taking" of plaintiffs' interests is a continuing transgression, and so we conclude that plaintiffs suffered irreparable harm. Similarly, defendants' continued transfer of interests to bona fide purchasers would have resulted in an inefficient multiplication of suits, and prejudiced plaintiffs' rights as a practical matter. Plaintiffs were fully entitled to a preliminary injunction.

We believe that defendants' complaints concerning the scope of the injunction are meritless. The injunction prohibits defendants from alienating their interests, places proceeds from the sale of oil into escrow pending final adjudication, and requires defendants to furnish an accounting. Before the injunction, defendants billed plaintiffs for operating costs; under the injunction, plaintiffs' costs should be paid from the escrow. Assuming defendants' billing practices to be consistent, nonplaintiff investors should still be paying their share of such costs. As to the argument that the escrow constricts defendants' personal oil money, suffice it to say that the ownership of escrow funds should and shall await the trial court's judgment.

We believe the issues addressed to the temporary restraining order are subsumed by our decision concerning the preliminary injunction. (See *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1983), 94 Ill. 2d 535, 545-46, 447 N.E.2d 288.) The order of the circuit court granting a preliminary injunction is affirmed.

Affirmed.

MEJDA, P.J., and O'CONNOR, J., concur.