THE FIRST CHURCH OF DELIVERANCE *et al.*, Plaintiffs-Appellees, v. GLADYS HOLCOMB *et al.*, Defendants-Appellants.

First District (1st Division)   No. 85—2248

Opinion filed December 1, 1986.—Rehearing denied January 16, 1987.

Gladys Holcomb, Arthur J. Sloan, and Bernard Allen Fried, *pro se*, and Robert Korenkiewicz, all of Chicago, for appellants.

Garland W. Watt and Hubert O. Thompson, both of Chicago, for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

This action was brought by plaintiffs, First Church of Deliverance and Reverend Eugene D. Gray, the church's minister and current president of its board of directors, to enjoin the church's bank, convalescent home, and members of its former board (defendants) from dissipating the church's assets or interfering with the management of the church. A temporary restraining order was issued, and after a hearing, the trial court granted a preliminary injunction in favor of plaintiffs. Defendants appeal, contending that: (1) the trial court erred in denying their motion for directed verdict with respect to plaintiffs' standing to institute this suit, and (2) the trial court erroneously granted a preliminary injunction against them. For the following reasons, we affirm.

The background of the present controversy may be summarized as follows. The First Church of Deliverance, located at 4315 South Wabash Avenue in Chicago, was founded in 1929 by the late Reverend Clarence H. Cobbs. In 1977 Cobbs incorporated the church as an Illinois not-for-profit corporation. When Cobbs died in 1979, Gladys Holcomb became president of the board of directors, and in January 1981, Eugene Gray was appointed as Cobbs' successor.

On January 11, 1985, an annual church meeting was held with anywhere from 300 to 1,000 members in attendance and Gray presiding. The meeting was called pursuant to oral and written notice. As of that day, the members of the church's board of directors were Gladys Holcomb, Kinard Holcomb, Arthur Sloan, Gervaise Hill, Ralph Goodpasteur, and Beatrice Miller, all of whom were present at the meeting, and the board's attorney was Bernard Fried. The same board, with the exception of Goodpasteur, also governed the Convalescent Home of the First Church of Deliverance.

After Gray introduced Garland Watt as his personal attorney, determined whether there were any outsiders present, and addressed certain preliminary matters, the meeting was held open to the general membership, who expressed various concerns about the church's finances. Shortly thereafter, a church member rose and recited a resolution requesting the removal of the current board members from office. A motion was then made recommending Gray, Ralph Goodpasteur, and three other individuals, along with Garland Watt as church counsel, to constitute the new board. It is disputed as to whether both motions were approved by acclamation of those in attendance, but most witnesses agreed that it was not the custom of the church to "vote." The nominations were accepted.

On January 12, 1985, the new board held its first meeting. Two days later, this action was filed against Seaway National Bank of Chicago, the Convalescent Home of the First Church of Deliverance, and Gladys Holcomb, Arthur Sloan, and Bernard Fried, the ousted board's president, secretary, and attorney respectively. In their complaint, plaintiffs sought an accounting, and among other things, to preclude defendants from disposing of, negotiating, or transferring church assets or taking any other action interfering with the ownership rights of the church. A temporary restraining order was issued, and a hearing on plaintiffs' motion for a preliminary injunction was conducted in which the trial court first considered the validity of the January 11 meeting removing the former board. The following evidence was initially presented with respect to that issue.

Ralph Goodpasteur, a past and current member of the board, testified that annual church meetings led by Reverend Gray had been held since 1981, usually at the beginning of the year. During these meetings, which Gray announced both verbally and in the church bulletin, upcoming events were discussed. The church's bylaws, however, were never voted on, referred to, or consulted at these meetings, and no elections had ever been conducted.

Ethel Alexander, a member of the new board, testified, like Good-

pasteur, that Gray announced annual church meetings as well as presided over them. According to Alexander, while no prior elections had taken place, the resolution requesting the removal of the old board and the nomination of the new board were received by acclamation of those present at the January 11 meeting. She further stated that when Gray called for additional recommendations, none were offered, and when asked if he could work with the names submitted, Gray responded affirmatively.

Gray's recollection of the meeting in dispute was basically the same as that of Alexander. Gray added that he had no prior knowledge that an election was planned and asked his personal attorney to attend the meeting as a "monitor" to assist him in answering questions of members who had lodged complaints. After hearing the testimony of Gray, Goodpasteur, and Alexander, the trial court denied defendants' motion for directed verdict as to the propriety of the election.

The following testimony was rendered on behalf of plaintiffs in support of their request for a preliminary injunction. While defendant Sloan stated that he collected $4,000 to $6,000 weekly from church members, Ethel Alexander testified that thousands of dollars of utility bills belonging to the church and its various properties were due and owing and had to be paid by the new board on threats that the services would be terminated. On one occasion, due to an unpaid gas bill, the gas was turned off at the church's Maggie Drummond Community Center during subzero weather when the building was occupied with children. Pat Henley, the church's newly elected financial secretary, testified to a letter from the Metropolitan Sanitary District requesting immediate payment of a church bill dating back to December 1980. Moreover, the convalescent home's certified public accountant stated he disclaimed his audit reports as a result of the information contained in the home's books and records.

Defendant Sloan, who in his capacity as secretary and self-appointed treasurer managed the church's financial affairs, testified that he received $1,500-per-month salary from the church in addition to $100 per month for rent, both amounts having been established by Reverend Cobbs prior to his death. Sloan's rent allowance was increased in January 1985 to $300 by the church's executive committee consisting of Sloan, Gladys Holcomb, and Beatrice Miller.

Sloan stated that since 1979, no financial report including the church's income, expenses, and indebtedness had been submitted to the board or church body. He also testified that prior to March 1985, the church and its various properties were uninsured, and that real

estate taxes on the church's rental properties had been delinquent since 1979.

Sloan further stated that he had negotiated a contract to lease and sell the church's convalescent home without authorization of the church's board of directors. He subsequently showed the board this contract, but then executed a different one. Also without board approval, Sloan pledged $87,000 of the church's money to secure a loan for the convalescent home.

Sloan testified that attorney Fried had power of attorney for the church and, therefore, could buy and sell church properties without accounting to the board or anyone else. Furthermore, Sloan admitted that Fried had signed Sloan's name to a deed selling a hotel owned by the church without informing Sloan of the transaction or reporting the proceedings of that sale to the board of directors. When Fried was called to the witness stand and questioned about this sale, he asserted his fifth amendment privilege against self-incrimination. While Sloan was aware that Fried had recently been indicted for misappropriation of church funds, neither he nor the board took any action to investigate these allegations or question Fried about them.

After denying defendants' motion for a directed verdict with respect to the preliminary injunction, several witnesses testified on behalf of defendants regarding the nature of the January 11 meeting. Generally, they stated that they received notice of the meeting, but there was no indication that an election was scheduled. They further claimed that while no additional nominations for board members were offered, the outstanding nominations were opposed by various members, and no vote, either by voice, ballot, or a showing of hands, was conducted. They also stated that the church never held elections.

Gwendolyn Pettis, stewardess of the church who worked for Gray, testified that she was the member who read the resolution at the January 11 meeting requesting removal of the former board. She became dissatisfied with the board approximately three or four years ago when she realized the church was deteriorating, both physically and financially. She testified that although she worked closely with Gray, she never consulted him about her proposed resolution because "[h]e would absolutely forbid *** [her] to do it."

Lindsey Sims, a church trustee, testified that after Ms. Pettis read her resolution on January 11, he nominated the new board because "of the turmoil the church was in." He stated that he did not discuss his nominations with anyone, including Gray, before the meeting, although he did have conversations with Ms. Pettis about removing the board.

Defendants also called Reverend Gray, who testified that while he commented at the January 11 meeting that he needed a board who would be accountable to him, he did not accuse Holcomb, Sloan, or Fried of wrongfully transferring church property. He further stated that no specific quorum was required for annual meetings, that the church did not operate according to bylaws, and that oral, not written, demands were made to the board for a financial accounting of church affairs. Gray admitted using the term "vote" in his complaint and affidavits, although he testified that the church did not formally do so. He testified that he filed this action to protect the entire church, and was unable to identify any specific piece of property that had been or may be unlawfully transferred.

Arthur Sloan was recalled to the stand by defense counsel and testified primarily about whether the church conducted its affairs in accordance with the bylaws or custom. He testified that an amendment was made to the bylaws in 1977 stating that the church was never to be mortgaged and that no pastor could veto any actions of the board of directors. Consequently, according to Sloan, the church was governed by the board of directors.

On cross-examination defendant Sloan admitted that contrary to the bylaws: (1) Gray did not call the annual meetings pursuant to the "order and direction of the Board of Directors" because "it was always a custom that the *** preacher who was the chairman would call the annual meeting"; (2) the board did not give written or printed notice of the annual meetings; (3) no written waiver of notice was ever given; (4) the board did not have regular annual meetings since 1979; (5) no annual elections of officers by the board took place; and (6) checks had not been countersigned since the death of Reverend Cobbs.

While special meetings of the board were authorized by the bylaws, they were never conducted because, according to Sloan, "[W]hen preacher lived, we met anytime we got ready and we didn't give notices." Likewise, although the bylaws authorized committees, Sloan stated that, "There were no committees, Rev. Cobbs was all the committee." Sloan did testify earlier, however, that there was an executive committee. When asked specifically about minutes in the corporate record that purported to be of special meetings, Sloan replied that he never gave written notice of those meetings as the bylaws required.

Based on the evidence set forth above, the trial court concluded that plaintiffs met their burden on the elements necessary for injunctive relief. Regarding the propriety of the January 11 election, the

court asserted that the meeting "was at least of a type that would suggest that the church members do have a right to self-govern their particular church. The bylaws that have been introduced into evidence it appears have not been in the past followed. And, therefore, by custom and usage the church and the governing bodies adopted a different method of proceeding with the meetings." It is from this ruling as well as the court's denial of their motion for directed verdict that defendants appeal.

We initially address defendants' contention that the trial court erred in denying their motion for directed verdict regarding whether the January 11 meeting electing the new board of directors was valid. Defendants maintain plaintiffs lack standing to bring this action since the new board was "elected" in violation of the church's bylaws which provide that: (1) annual meetings shall be concerned with the coming year's program of events; (2) the remaining directors shall elect the successor of a director terminated for cause; and (3) the board of directors shall manage the church's affairs. As further support for their position, defendants argue that the church never held elections in the past, that the notice for the meeting did not disclose that an election was scheduled, and that voting by acclamation is an "irregular procedure." We find defendants' contention to be without merit.

■ It is well established that directed verdicts should be "entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Here, the evidence reveals that the bylaws adopted by the church in 1977 had been abandoned by its members. Ralph Goodpasteur, who has been a member of the church since 1948, testified that the bylaws had never been voted on, referred to, or consulted at annual meetings. More significantly, defendant Sloan himself admitted on cross-examination that in every instance posed by plaintiffs' counsel, the bylaws had not been followed. Accordingly, we find that the board of directors abrogated the bylaws by such nonuse. See *Johnson v. Sengstacke* (1948), 334 Ill. App. 620, 79 N.E.2d 761 (where resolution requiring that no person shall be hired or discharged without board approval had not been invoked for more than four years after its adoption, the court held that the board waived such resolution by nonuse).

■ Rather than bylaws, the record discloses that the church governed its meetings by custom. As in the past four years, Reverend Gray called the January 11 meeting, gave notice of it, and presided

over it. Most witnesses agreed that there is no specific quorum required at annual meetings and that members did not "vote" on church matters. The fact that no prior elections of board members had taken place did not preclude the congregation from removing directors who had acted to its detriment. Thus, we cannot conclude, with respect to the propriety of the January 11 meeting, that the evidence, when viewed in the light most favorable to plaintiffs, so overwhelmingly favors defendants that no contrary verdict could stand.

Defendants' reliance on *Westlake Hospital Association v. Blix* (1958), 13 Ill. 2d 183, 148 N.E.2d 471, *Rotary Club v. Harry F. Shea & Co.* (1983), 120 Ill. App. 3d 988, 458 N.E.2d 1002, and *Harris v. Board of Directors* (1977), 55 Ill. App. 3d 392, 370 N.E.2d 1121, to support the proposition that the tenure in office of the board of directors of an Illinois not-for-profit corporation is controlled entirely by the bylaws of the corporation, is misplaced. In each of those decisions, the board of directors operated pursuant to an established and recognized set of bylaws. In this case, however, as discussed above, the bylaws had been abandoned and, consequently, did not govern the church.

■ We next consider defendants' argument that the trial court incorrectly determined that plaintiffs demonstrated they had a "lawful right for which they seek protection," the first element necessary for injunctive relief. In this regard, defendants state in their brief that since "the threshold issue, namely the legality of the alleged ousting of the then Board of Directors and its replacement by a new group, was never established by the Plaintiffs *** all reference to any charged acts of wrongdoing by the Plaintiffs against the Defendants *** is completely outside of the parameters of this Brief, as well as of this Appeal." In their reply brief, however, defendants address the remaining elements necessary for injunctive relief, and, therefore, this court will do so as well.

We initially note that issuance of a preliminary injunction to preserve the status quo pending a final decision on the merits is solely within the discretion of the trial court, and its ruling will not be disturbed on appeal absent an abuse of that discretion. (*Jefco Laboratories, Inc. v. Carroo* (1985), 136 Ill. App. 3d 793, 483 N.E.2d 999.) Based on our review of the record before us, we believe that the trial court acted properly within its discretion in enjoining defendants.

■ ■ Generally, a party seeking injunctive relief must show that: (1) it possesses a clearly ascertainable right which needs protection; (2) it will be irreparably injured if the injunction is not granted; (3) it has no adequate remedy at law; and (4) it is likely to succeed on the

merits. (*Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123.) In the instant case, defendants assert that because the "election" of the new board "was completely devoid of any legal effect," plaintiffs have failed to show that they have any rights in need of protection. Given our finding above that the January 11 meeting was in face properly held, defendants' argument must fail. It is evident that the church and Reverend Gray, as its minister and new president, both have a "clearly ascertainable right" in the church's finances, properties, and reputation in the community.

Plaintiffs have also shown the injury necessary to justify issuance of a preliminary injunction. Throughout the course of the lengthy preliminary injunction hearing, numerous instances of mismanagement and malfeasance by defendants were detailed and sufficient evidence was produced that if the injunction was not granted, irreparable harm to the church and its convalescent home would result.

Finally, it is clear that plaintiffs have no adequate remedy at law. The damage to the church's reputation in the community as well as the loss of the confidence of its members cannot be measured in monetary terms. Moreover, in light of the fact that no accounting of the church's expenditures, receipts, or indebtedness has been tendered to the board of directors since 1979, there is no way of determining the pecuniary damage the church has suffered. Injunctive relief is therefore the only means by which plaintiffs' injury can be redressed. We further find that plaintiffs have demonstrated a likelihood of prevailing with regard to the three factors discussed above.

For the foregoing reasons, the judgment of the circuit court of Cook County granting a preliminary injunction against defendants is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.